Eugene LONERGAN, Sr., on Behalf of
Himself and All Others Similarly
Situated, Plaintiff,

v.

EPE HOLDINGS LLC, Enterprise GP
Holdings, L.P., Oscar S. Andras,
Ralph S. Cunningham, Richard H.
Bachmann, Randa Duncan Williams,
Thurmon M. Andress, Charles E.
McMahen, Edwin E. Smith, and B.W.
Waycaster, Defendants.

C.A. No. 5856–VCL.

Court of Chancery of Delaware.

Submitted: Oct. 8, 2010.
Decided: Oct. 11, 2010.

Seth D. Rigrodsky, Brian D. Long, Rigrodsky & Long, P.A., Wilmington, Delaware; Donald J. Enright, Elizabeth K. Tripodi, Rosalee B. Connell, Finkelstein Thompson LLP, Washington, District of Columbia; Attorneys for Plaintiff.

Rolin P. Bissell, Tammy L. Mercer, Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware; Karl S. Stern, Kenneth P. Held, Vinson & Elkins L.L.P., Houston, Texas; Attorneys for Defendants EPE Holdings LLC, Enterprise GP Holdings L.P., Oscar S. Andras, Ralph S. Cunningham and Richard H. Bachmann.

Gregory P. Williams, Catherine G. Dearlove, Srinivas M. Raju, Blake Rohrbacher, Richards, Layton & Finger, P.A., Wilmington, Delaware; Attorneys for Defendants Thurmon M. Andress, Charles E. McMahen, and B.W. Waycaster.

## OPINION

LASTER, Vice Chancellor.

The plaintiff holds limited partner units ("LP units") in defendant Enterprise GP Holdings, L.P. ("Holdings"), a publicly traded Delaware master limited partnership ("MLP"). On behalf of a putative class of all holders of LP units, he challenges a merger between Holdings and non-party Enterprise Products Partners L.P. (the "Partnership"), a second publicly traded Delaware MLP. I refer to the merger and its related components as the "Proposed Transaction." Through its 100% ownership of the Partnership's general partner, Holdings controls the Partnership. Based on conflicts of interest and alleged disclosure violations, the plaintiff seeks to enjoin the Proposed Transaction. This decision addresses a motion to expedite. Because the complaint does not plead a colorable claim, the motion is denied.

## I. FACTUAL BACKGROUND

The facts are drawn from the complaint and the documents it incorporates by reference. The principal documents are the Preliminary Registration Statement on Form S–4 for securities to be issued in connection with the Proposed Transaction (the "Form S–4") and the First Amended and Restated Agreement of Limited Partnership of Enterprise GP Holdings L.P. (the "Holdings LP Agreement"). At this procedural stage, the plaintiff receives the benefit of all plausible inferences.

### A. The Two–Tier MLP Structure

Despite its non-party status, the Partnership plays a critical role in the case. The Partnership describes itself as "a leading North American provider of midstream energy services to producers and consumers of natural gas, natural gas liquids ('NGLs'), crude oil, refined products, and certain petrochemicals." The Partnership's LP units trade on the New York Stock Exchange under the symbol "EPD."

According to the Form S–4,

The Partnership's energy asset network links producers of natural gas, NGLs, and crude oil from some of the largest supply basins in the United States, Canada and the Gulf of Mexico with domestic consumers and international markets. The Partnership's assets include: 49,100 miles of onshore and offshore pipelines; approximately 200 million barrels of storage capacity for NGLs, refined products, and crude oil; and 27 billion cubic feet of natural gas storage capacity. The Partnership's midstream energy operations include: natural gas

transportation, gathering, processing and storage, NGL transportation, fractionation, storage, and import and export terminaling; crude oil and refined products transportation, storage and terminaling; offshore production platforms; petrochemical transportation and storage; and a marine transportation business that operates primarily on the United States Inland and Intercoastal Waterway systems and in the Gulf of Mexico.

Form S–4 at 1. These operations generate cash. Because it is structured as a pass-through entity, the Partnership can distribute its cash in a tax-efficient manner. It is widely understood, and the complaint alleges, that MLPs are popular investments precisely because they distribute most of their free cash flow. Investors purchase LP units for yield, and MLPs try to increase their yield over time.

Holdings is also a publicly traded Delaware MLP. Its LP units trade on the New York Stock Exchange under the ticker symbol "EPE." Holdings controls the Partnership through its 100% ownership of the limited liability company that serves as the Partnership's general partner (the "Partnership GP"). For simplicity, except where context requires, I will refer to Holdings as the general partner of the Partnership without referencing the intervening entity.

Investors in Holdings LP units want yield, just like investors in Partnership LP units. Rather than owning operating assets, Holdings predominantly owns interests in the Partnership. Directly or through affiliates, Holdings owns:

- A 2% economic interest in the Partnership attributed to Holdings' general partner interest.
- 21,563,177 Partnership LP units, representing approximately 3.4% of the outstanding limited partner interest.

- All of the Partnership's incentive distribution rights ("IDRs"), which entitle the holder to a contractually defined share of the Partnership's distributable cash.

When the Partnership makes distributions, these interests generate cash for Holdings. Holdings then makes distributions to its own unitholders.

In the two-tier MLP structure, the same underlying operating assets provide cash for distributions at both the Holdings and Partnership levels. But because Holdings receives the bulk of its distributions through the IDRs, its cash distribution profile differs from the Partnership. The IDRs are structured so that when distributions from the Partnership increase, the percentage of cash received by the IDRs increases. IDRs incentivize a general partner, whose economic general partner interest in the MLP is otherwise fixed and relatively small, to manage the MLP to maximize cash flow for the LP units. The IDRs are a form of pay for performance, with performance measured in distributable cash. In MLP lingo, as the operating partnership performs better, the general partner "rides up the splits" and receives a greater share of the incremental cash generated by its efforts. Those cash flows are also attractive to investors, which enables general partners to take their entities public. Investors who purchase LP interests in a publicly traded general partner hope to receive the upside of greater distributions from the "high splits" on the IDRs. Investors who purchase limited partner interests in the lower-tier entity trade the upside of the IDRs for the more stable and reliable cash flows that result from a prior claim on the operating partnership, up to an established level of quarterly distributions.

While helpful as a means of incentivizing general partner performance and aligning

interests, IDRs have downsides. Most obviously, the overhang of the IDR claim on cash flows limits the distributions available to the LP units. This reduces the attractiveness of LP units, resulting in a lower trading price and making them less attractive as a source of new money or as an acquisition currency.[1] Equally important, as the operating partnership performs better, the increasing IDR claim drives up its cost of equity capital, which limits its ability to undertake new projects.[2]

The IDRs held by Holdings exemplify these challenges. Holdings received approximately 15.3% of the cash distributed by the Partnership in August 2010, and Holdings would be entitled to 25% of any incremental increase in Partnership distributions beyond the current level of $0.575 per Partnership LP unit. At the current level of distributions, Holdings will receive an additional $0.10379 per quarter for each new LP unit issued by the Partnership.

## B. A Web Of Conflicts

The two-tier MLP structure creates a web of conflicts. As noted, Holdings is the Partnership's general partner and controls the Partnership. Holdings' general partner is defendant EPE Holdings, LLC ("Holdings GP"). All of the member interests in Holdings GP are owned by nonparty Dan Duncan LLC ("DDLLC"). All of the member interests of DDLLC are owned by three individuals who serve as voting trustees under a voting trust agreement. Under a second voting trust agreement, the same three individuals own a majority of the voting stock of Enterprise Products Company ("EPCO"), a privately

held corporation. EPCO beneficially owns 76% of Holdings' outstanding LP units and 27% of the Partnership's outstanding LP units. Control of the entire two-tier structure ultimately rests with the three voting trustees.

The three voting trustees are Randa Duncan Williams, Ralph S. Cunningham, and Richard H. Bachmann. Williams is also director of Holdings GP and Chairman of EPCO. Cunningham is a director, President, and CEO of Holdings GP and a director of EPCO. Bachmann is Executive Vice President and a director of Holdings GP; President, CEO, Chief Legal Officer, and a director of EPCO, and Executive Vice President, Secretary, and Chief Legal Officer of Partnership GP.

The Holdings GP board of directors (the "Board") has eight members. All eight members have been named as defendants. As noted, three of the members are the voting trustees. One member, O.S. Andras, was formerly President (from 1998 until 2004), CEO (from 1998 to 2005), Vice Chairman (from 2004 to 2005), and a director (from 1998 to 2006) of Partnership GP; and President and CEO of EPCO (from 1996 to 2001). The remaining four members—Thurmon M. Andress, Charles E. McMahen, Edwin E. Smith, and B.W. Waycaster—are facially independent, outside directors.

Prior to its consideration of the Proposed Transaction, the members of the Board's Audit, Conflicts and Governance Committee (the "Audit Committee") were Andress, McMahen, and Smith. Early in the process, Smith recused himself be-

---

1. One might fairly respond that without the incentivizing effects of the IDRs, the general partner would have greater reason to shirk, which would reduce the attractiveness of the LP units. As always, there is no free lunch, and both effects logically are present to varying and contestable degrees.

2. For additional discussion of IDRs and the issues they present, see John Goodgame, *Master Limited Partnership Governance*, 60 Bus. Law. 471, 477–79, 504–05 (2005), and Phillip R. Clark & Peter O. Hansen, *Understanding Master Limited Partnerships: What Every Oil and Gas Lawyer Needs To Know*, 54 Rocky Mtn. Min. L. Inst. § 22.03 (2008).

cause he, alone of the three individuals, owns a greater number of Partnership LP units than Holdings LP units, which could be viewed as creating a potential economic conflict with his obligations to Holdings. Waycaster, who has no such conflict, was added to the Board and joined the Audit Committee.

## C. The Proposed Transaction

The Proposed Transaction will flatten the two-tier MLP structure. Holdings will merge into a subsidiary of the Partnership, and each Holdings LP unit will be converted into 1.5 Partnership LP units. Immediately after the merger, Holdings' IDRs, its 21,563,177 Partnership LP units, and its 2% general partner interest in the Partnership will be cancelled.

Holdings GP is not receiving preferential treatment. Holdings GP currently owns a 0.01% general partner interest in Holdings. Just prior to the merger, this interest will be re-characterized as a non-economic general partner interest and a 0.01% limited partnership interest, represented by 13,921 Holdings LP units. In the merger, the Holdings LP units will be converted into Partnership LP units at the same exchange ratio. Holdings GP's non-economic general partner interest in Holdings will be converted into a non-economic general partner interest in the Partnership, and Holdings GP will continue after the Proposed Transaction as the Partnership's general partner. Control over the Partnership will therefore remain with Holdings GP and ultimately the three voting trustees.

For its part, EPCO will receive less favorable treatment than unaffiliated holders. Pursuant to a Distribution Waiver Agreement, EPCO has agreed to waive its rights to quarterly distributions on a designated number of Partnership LP units for five years after the Proposed Transaction closes. In the first year, distributions will be waived for 30,610,000 Partnership LP units. The number of units covered by the waiver will decline in each subsequent year until in the fifth year it reaches 17,690,000 Partnership LP units. The waiver has the effect of increasing the amount of distributable cash available for unaffiliated holders during the five-year period. Based on the quarterly distribution rate of $0.575 per limited partner unit paid by the Partnership in the second quarter of 2010, the waived distributions total approximately $275 million. If distributions increase, so will that figure.

The exchange ratio of 1.5 Partnership LP units for each Holdings LP unit represents an approximately 16% premium to the closing price of Holdings units on September 3, 2010, the last trading day before the public announcement of the proposed merger. It represents an approximately 40% premium over the average closing price of Holdings units during the one-year period ended September 3, 2010. Based on pro forma estimates, the quarterly cash distributions to be received by former Holdings LP unitholders post-merger should be 54% greater than Holdings distributions pre-merger. The Proposed Transaction is expected to be accretive to the distributions received by Holdings unitholders in each year through 2015, the last year for which projections were developed. Since investors hold LP units for yield, distributions are a critical metric.

## D. The Path To The Proposed Transaction

According to the Form S–4, "[u]nitholders of the Partnership and the investment community ... focused on the Partnership's cost of capital after other midstream publicly traded partnerships ... acted to reduce their long-term cost of capital by eliminating or reducing their IDRs

through merger or other actions." Form S–4 at 36. During the summer of 2010, the Partnership's counsel met with Bachmann, Cunningham, and members of Partnership management to discuss the "trends in simplification of publicly traded partnerships." *Id.* They also reviewed proposed federal tax legislation addressing the treatment of "carried interests" that would have an earliest possible effective date of January 1, 2011. Under the proposed legislation, a potential simplification transaction that generally would be non-taxable to unitholders under current law would be taxable under the proposed law. In layman's terms, Holdings LP unitholders won't pay tax if a deal closes in 2010. They face a real risk of paying tax if the legislation passes and a deal closes in 2011. For holders of Holdings LP units, and particularly for EPCO, having to pay tax makes a big difference.

On July 7, 2010, Partnership management proposed to the Holdings Audit Committee that the two MLPs pursue a simplification transaction. Later that day, the Holdings Audit Committee spoke with the EPCO voting trustees about the idea. During the call, the EPCO voting trustees made clear that they would entertain an offer from the Partnership that the Audit Committee approved as fair and reasonable, but they would not sell to a third party and would not entertain any third-party proposals.

Over the following days, the Audit Committee assembled a team of independent advisors. It retained Baker & Hostetler LLP as its legal counsel and Richards Layton & Finger, P.A. as special Delaware counsel. It hired Morgan Stanley as its financial advisor. Recognizing the potential conflicts of interest in a transaction between Partnership and Holdings, the Holdings GP Board formally delegated to the Audit Committee full power to negotiate and accept or reject any deal.

In early August, negotiations began in earnest. On August 3, the Partnership proposed an exchange ratio of 1.377 Partnership LP units for each Holdings unit, representing a 2.6% premium over the July 30 closing price. After a week of analysis by its advisors, the Holdings Audit Committee rejected the offer and declined to counter.

A day later, the Partnership proposed an increased exchange ratio of 1.40 Partnership LP units per Holdings LP unit, but conditioned the proposal on EPCO waiving distributions for a specified number of units from 2011 to 2014. The waiver was needed to make the proposal neutral with regard to Partnership distributions. Put differently, the Partnership was saying that without the waiver, the proposed exchange ratio would give too much value to the holders of Holdings LP units. The Audit Committee decided the price was still too low, rejected the offer, and declined to counter. Talks officially broke down on August 12.

On August 23, the Partnership reopened the bidding at 1.475 Partnership LP units per Holdings LP unit conditioned on EPCO waiving its distributions for a specified number of units from 2011 to 2015. On August 30, the Holdings Audit Committee countered at a ratio of 1.535.

At this point, the Partnership made what it described as its "final offer": 1.50 Partnership LP units per Holdings LP unit with the EPCO waiver. After consulting with its advisors, the Holdings Audit Committee agreed on the ratio. Once formal agreements had been negotiated, Morgan Stanley opined that the transaction was fair from a financial point of view to the unaffiliated holders of Holdings LP units, and the Audit Committee conferred on the Proposed Transaction its "Special Approval" for purposes of the Holdings LP Agreement.

### E. The Current Litigation

The Proposed Transaction was announced on September 7, 2010. The preliminary Form S–4 was filed with the Securities and Exchange Commission on September 16, 2010. On September 29, 2010, the plaintiff filed his complaint and moved simultaneously for an expedited hearing on an application for preliminary injunction.

## II. LEGAL ANALYSIS

■ A motion to expedite should be granted only if "the plaintiff has articulated a sufficiently colorable claim and shown a sufficient possibility of a threatened irreparable injury, as would justify imposing on the defendants and the public the extra (and sometimes substantial) costs of an expedited preliminary injunction proceeding." *Giammargo v. Snapple Beverage Corp.*, 1994 WL 672698, at *2 (Del.Ch. Nov. 15, 1994) (Allen, C.). The complaint fails to assert a sufficiently colorable claim.

### A. The Implied Covenant Of Good Faith And Fair Dealing

The complaint contains the types of allegations commonly advanced by stockholder plaintiffs when challenging a merger involving a corporation. In such a pleading, the plaintiff asserts claims for breaches of fiduciary duty. Here, the plaintiff seeks to cloak familiar breach of fiduciary duty theories in the guise of the implied covenant of good faith and fair dealing. The complaint thus asserts at the outset that the defendants have been sued "for their breaches of duties arising under the implied contractual covenant of good faith and fair dealing." Compl. ¶ 1. Later the complaint asserts that the defendants "owe the Company's unitholders, as a matter of law, duties arising under the implied contractual covenant of good faith and fair dealing." *Id.* ¶ 11; *see id.* ¶¶ 12–14.

Reminiscent of *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del.1986), the complaint alleges that "the Board of [Holdings GP], which controls and manages [Holdings], failed to conduct an adequate and fair sales process to sell [Holdings] prior to agreeing to the Proposed Transaction." Compl. ¶ 6. It continues: "In agreeing to a sale without conducting a fair and adequate sales process, gathering information about the Company's net worth, or soliciting other bids, [the] Individual Defendants are allowing [Holdings] to be purchased at well below the Company's true value." Compl. ¶ 7.

Reminiscent of *Kahn v. Lynch Communications Systems, Inc.,* 638 A.2d 1110 (Del.1994), the complaint asserts that

[t]he Proposed Transaction ... represents a classic case of a party standing on both sides of the transaction. In particular, EPCO and its affiliates own a majority stake in [Holdings] and significant equity interests in [the Partnership] as well, creating divided loyalties that have led to the agreement of [sic] a grossly unfair merger to the detriment of the [Holdings'] minority unitholders.

Compl. ¶ 6. In light of this conflict, the complaint insists that the Proposed Transaction be conditioned on the "approval of a 'majority of the minority' of outstanding units." *Id.* "Given that one primary entity—EPCO and its affiliates—control 76% of the units of [Holdings], and that this majority shareholder [sic] stands on both sides of the transaction, [the] Individual Defendants should have conditioned the Proposed Transaction on approval of the majority vote of the minority unitholders not affiliated with EPCO." *Id.* ¶ 66; *see id.* ¶¶ 64–65, 67.

The complaint also alleges the defendants failed to disclose all material information reasonably available in connection

with the LP unitholder vote. The complaint identifies fourteen items that the Form S–4 allegedly failed to disclose. *See* Compl. ¶¶ 81–88.

The complaint frames each of these theories using the implied covenant of good faith and fair dealing because the Holdings LP Agreement eliminates default fiduciary duties in accordance with the authority granted by the Delaware Limited Partnership Act (the "LP Act"). Section 17–1101(d) of the LP Act provides:

> To the extent that, at law or in equity, a partner or other person has duties (including fiduciary duties) to a limited partnership or to another partner or to another person that is a party to or is otherwise bound by a partnership agreement, the partner's or other person's duties may be expanded or restricted or eliminated by provisions in the partnership agreement; provided that the partnership agreement may not eliminate the implied contractual covenant of good faith and fair dealing.

6 *Del. C.* § 17–1101(d).

Two sections of the Holdings LP Agreement eliminate all fiduciary duties. Section 7.9(e) states:

> Except as expressly set forth in this Agreement, neither [Holdings GP] nor any other Indemnitee shall have any duties or liabilities, including fiduciary duties, to the Partnership or any Limited Partner and the provisions of this Agreement, to the extent that they restrict or otherwise modify the duties and liabilities, including fiduciary duties, of [Holdings GP] or any other Indemnitee otherwise existing at law or in equity,

are agreed by the Partners to replace such other duties and liabilities of [Holdings GP] or such other Indemnitee.[3]

Section 7.10(d) further provides:

> Any standard of care and duty imposed by this Agreement or under the Delaware Act or any applicable law, rule or regulation shall be modified, waived or limited, to the extent permitted by law, as required to permit [Holdings GP] to act under this Agreement and to make any decision pursuant to the authority prescribed in this Agreement, so long as such action is reasonably believed by [Holdings GP] to be in, or not inconsistent with, the best interests of [Holdings].

In light of these provisions, the only duties owed by Holdings GP flow from (i) contractual standards set forth in the Holdings LP Agreement and (ii) the implied covenant of good faith and fair dealing. The complaint does not identify any provision of the Holdings LP Agreement that the Proposed Transaction might violate. It relies solely on the implied covenant.

■■■ The implied covenant is not a substitute for fiduciary duty analysis. "The covenant is 'best understood as a way of implying terms in the agreement' .... Existing contract terms control, however, such that implied good faith cannot be used to circumvent the parties' bargain, or to create a free-floating duty unattached to the underlying legal documents." *Dunlap v. State Farm Fire & Cas. Co.,* 878 A.2d 434, 441 (Del.2005) (quoting *E.I. DuPont de Nemours & Co. v. Pressman,* 679 A.2d 436, 443 (Del.1996)) (other citations omit-

---

**3.** "Indemnitee" is defined to include "(a) [Holdings GP], any Departing General Partner and any Person who is or was an Affiliate of [Holdings GP] or any Departing General Partner, (b) any Person who is or was a member, director, officer, fiduciary or trustee of [Holdings, and] (c) any Person who is or was an officer, member, partner, director, employee, agent or trustee of [Holdings GP] or any Departing General Partner or any Affiliate of [Holdings GP] or any Departing General Partner, or any Affiliate of such Person." Holdings LP Agreement at A–4.

ted). The Court must focus on "what the parties likely would have done if they had considered the issues involved." *Cincinnati SMSA Ltd. P'ship v. Cincinnati Bell Cellular Sys. Co.*, 708 A.2d 989, 992 (Del. 1998). It must be "clear from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of … had they thought to negotiate with respect to that matter." *Katz v. Oak Indus. Inc.*, 508 A.2d 873, 880 (Del.Ch.1986) (Allen, C.). "The doctrine thus operates only in that narrow band of cases where the contract as a whole speaks sufficiently to suggest an obligation and point to a result, but does not speak directly enough to provide an explicit answer." *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 146 (Del.Ch.2009).

■■ Wielding the implied covenant is a "cautious enterprise." *Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del.2010). Implying contract terms is an "occasional necessity … to ensure [that] parties' reasonable expectations are fulfilled," but "[t]his quasi-reformation … should be a rare and fact-intensive exercise, governed solely by issues of compelling fairness." *Dunlap v. State Farm & Cas. Co.*, 878 A.2d 434, 442 (Del.2005) (internal quotation marks omitted). Delaware law "will only imply contract terms when the party asserting the implied covenant proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected." *Nemec*, 991 A.2d at 1126. "Parties have a right to enter into good and bad contracts[;] the law enforces both." *Id.* at 1126.

■ When an LP agreement eliminates fiduciary duties as part of a detailed contractual governance scheme, Delaware courts should be all the more hesitant to resort to the implied covenant. Fiduciary duty review empowers courts to determine how a governance scheme should operate under particularized factual circumstances. Although the availability of *ex post* fiduciary review inherently produces some degree of uncertainty, "there is good reason to suppose it can be efficient." *Equity–Linked Investors, L.P. v. Adams*, 705 A.2d 1040, 1055 n. 48 (Del.Ch.1997) (Allen, C.).

■ When parties exercise the authority provided by the LP Act to eliminate fiduciary duties, they take away the most powerful of a court's remedial and gap-filling powers. As a result, parties must draft an LP agreement as completely as possible, and they bear the risk of incompleteness. If the parties have agreed how to proceed under a future state of the world, then their bargain naturally controls. But when parties fail to address a future state of the world—and they necessarily will because contracting is costly and human knowledge imperfect—then the elimination of fiduciary duties implies an agreement that losses should remain where they fall.[4] After all, if the parties wanted courts to be in the business of shifting losses after the fact, then they would not have eliminated the most powerful tool for doing so.

■ Respecting the elimination of fiduciary duties requires that courts not

---

4. More completely, losses remain where they fall absent renegotiation. A relational contract like an LP agreement provides ample opportunities to renegotiate. The Distribution Waiver Agreement is one example. Rather than insisting on full distribution rights, EPCO waived distributions over a five-year period for the benefit of unaffiliated holders of Partnership LP units. In another example, Holdings GP voluntarily relinquished the 50% tier of its IDRs in 2002. *See* Goodgame, *supra*, at 504.

bend an alternative and less powerful tool into a fiduciary substitute. The nature of the implied covenant of good faith and fair dealing is "quite different from the congeries of duties that are assumed by a fiduciary." *Katz,* 508 A.2d at 879 n. 7. "Delaware's implied duty of good faith and fair dealing is not an equitable remedy for rebalancing economic interests after events that could have been anticipated, but were not...." *Nemec,* 991 A.2d at 1128. To use the implied covenant to replicate fiduciary review "would vitiate the limited reach of the concept of the implied duty of good faith and fair dealing." *Id.* To the extent the complaint seeks to reintroduce fiduciary review through the backdoor of the implied covenant, it fails to state a colorable claim.

## B. The *Revlon* and *Lynch* Allegations

The complaint contains assorted allegations about what should have been done to develop alternatives, negotiate the Proposed Transaction, and test its fairness. As discussed above, the contentions fall loosely into two categories: (i) assertions that there should have been a search for alternative transactions (*Revlon* ) and (ii) insistence on the need for a majority-of-the-minority vote (*Lynch* ).

■■■■ Both categories of allegations err in assuming that Delaware common law decisions identify particular steps that fiduciaries must follow. The Delaware Supreme Court has clarified on multiple occasions that "there is no single blueprint that a board must follow to fulfill its duties."[5] Rather than establishing conduct requirements in the manner of a legislature or

regulatory agency, *Revlon* and its progeny identify a recurring situation in which Delaware courts apply a heightened *standard of review.* In a final stage transaction—be it a cash sale, a break-up, or a transaction like a change of control that fundamentally alters ownership rights—there are sufficient dangers to merit employing enhanced scrutiny, which requires that defendant fiduciaries "bear the burden of persuasion to show that their motivations were proper and not selfish" *and* that "their actions were reasonable in relation to their legitimate objective." *Mercier v. Inter–Tel (Delaware), Inc.,* 929 A.2d 786, 810 (Del. Ch.2007). Framed more specifically for the M & A context, enhanced scrutiny places the burden on the defendant fiduciaries to show that they acted reasonably to obtain for their beneficiaries the best value reasonably available under the circumstances. *Paramount Commc'ns Inc. v. QVC Network, Inc.,* 637 A.2d 34, 48–49 (Del.1994).

■■■■ The entire fairness standard under *Lynch* is likewise a standard of review. It does not require specific transactional features like a majority-of-the-minority vote. Using specific transactional features can change the standard of review. *See, e.g., In re CNX Gas Corp. S'holders Litig.,* 2010 WL 2705147, at *4–6 (Del.Ch. July 5, 2010) (describing alternative standards of judicial review resulting from different combinations of transactional features and certifying interlocutory appeal to resolve conflict), *appeal refused,* 2010 WL 2690402 (Del.2010) (TABLE). They also can be evidence of fairness. *E.g., Weinberger v.*

---

5. *Barkan v. Amsted Indus., Inc.,* 567 A.2d 1279, 1286 (Del.1989); *accord Lyondell Chem. Co. v. Ryan,* 970 A.2d 235, 243 (Del. 2009) ("there are no legally prescribed steps that directors must follow to satisfy their *Revlon* duties"). *See generally In re Dollar Thrifty S'holder Litig.,* 2010 WL 3503471, at *17 (Del. Ch. Sept. 8, 2010) ("[A]t bottom *Revlon* is a test of reasonableness; directors are generally free to select the path to value maximization, so long as they choose a reasonable route to get there."); *In re Netsmart Techs., Inc. S'holders Litig.,* 924 A.2d 171, 192 (Del.Ch. 2007) ("[*Revlon* ] does not, of course, require every board to follow a judicially prescribed checklist of sales activities.").

*UOP, Inc.,* 457 A.2d 701, 709 n. 7 (Del. 1983) (observing that the use of an independent negotiating committee "is strong evidence that the transaction meets the test of fairness"). But regardless of whether any features are deployed, a Delaware court "determines entire fairness based on all aspects of the entire transaction." *Valeant Pharms. Int'l v. Jerney,* 921 A.2d 732, 746 (Del.Ch.2007); *accord Weinberger,* 457 A.2d at 711 ("All aspects of the issue must be examined as a whole since the question is one of entire fairness.").

Holdings is a limited partnership, and the Holdings LP Agreement establishes a contractual standard of review that supplants fiduciary duty analysis. Under Section 7.9(a) of the Holdings LP Agreement, when a decision involves a conflict of interest,

> any resolution or course of action by [Holdings GP] or its Affiliates in respect of such conflict of interest shall be permitted and deemed approved by all Partners, and shall not constitute a breach of this Agreement or of any agreement contemplated herein or therein, or of any duty stated or implied by law or equity, if the resolution or course of action in respect of such conflict of interest is (i) approved by Special Approval, (ii) approved by the vote of a majority of the Units excluding Units owned by [Holdings GP] and its Affiliates, (iii) on terms no less favorable to [Holdings] than those generally being provided to or available from unrelated third parties or (iv) fair and reasonable to [Holdings], taking into account the totality of the relationships between the parties involved (including other transactions that may be particularly favorable or advantageous to the Partnership).

Holdings LP Agreement § 7.9(a). By using the term "or," Section 7.9(a) estab-lishes four alternative standards of review. If the Proposed Transaction meets any of the four, then it "shall be permitted and deemed approved by all Partners, and shall not constitute a breach of this Agreement or of any agreement contemplated herein or therein, or of any duty stated or implied by law or equity." *Id.* None of the four standards of review requires that Holdings GP check off a specific laundry list of actions.

Section 7.9(a)(ii) disposes of the plaintiff's contention that the implied covenant of good faith and fair dealing requires that the Proposed Transaction be conditioned on a majority-of-the-minority vote. Section 7.9(a)(ii) identifies approval "by the vote of a majority of the Units excluding Units owned by [Holdings GP] and its Affiliates" as one of the four alternative means by which a transaction can be validated. Section 7.9(a) necessarily contemplates that a transaction can be validated under Section 7.9(i), (iii), or (iv), which do not require a majority-of-the-minority vote. "[T]he implied covenant cannot be invoked to override express provisions of a contract." *Kuroda v. SPJS Holdings, L.L.C.,* 971 A.2d 872, 888 (Del.Ch.2009).

Section 7.9(a)(iii) similarly disposes of the plaintiff's contention that implied covenant requires an "adequate and fair sales process." The standard of review described in Section 7.9(a)(iii) contemplates "terms no less favorable to [Holdings] than those generally being provided to or available from unrelated third parties." To meet that standard, Holdings GP might want (but would not be required) to explore third-party alternatives or test a transaction in the market. The inclusion of Section 7.9(a)(iii) shows that the drafters of the Holdings LP Agreement contemplated third-party-sale standards. It would have been easy to mandate a sales process, even to the point of requiring

specific auction procedures. The Holdings LP Agreement does not contain any such requirement.

Read more generally, the complaint asserts that the implied covenant constrains the defendants' ability to rely on Section 7.9(a)(i), which allows a transaction to be validated if "approved by Special Approval." That concept in turn is defined as "approval by a majority of the members of the Audit and Conflicts Committee." Holdings LP Agreement at A–8. It is undisputed that the Audit Committee granted Special Approval, and the defendants naturally rely heavily on that fact in contending that the plaintiff's claims are not colorable. The plaintiff responds that Special Approval cannot permit the defendants to engage in any conflicted transaction, no matter how unfair or inequitable, free of any judicial scrutiny. Charitably read, the complaint can be construed to contend that if Special Approval is unavailable because of violations of the implied covenant, and if there is no majority-of-the-minority vote, then the Proposed Transaction should be enjoined because the defendants cannot satisfy the standards set forth in Sections 7.9(a)(iii) and (iv).

The plaintiff correctly contends that the implied covenant constrains the Special Approval process. When considering the LP agreement of a different MLP (coincidentally an MLP-affiliate of Holdings and the Partnership), I wrote:

> While I agree that [the Special Approval] provisions establish a weighty defense, the syllogism of "if Teppco Audit Committee approval, then judgment for the defendants" does not automatically follow. In language employed by Vice Chancellor Lamb when rejecting a similarly absolutist interpretation of a special approval provision, it is "much too simplistic." *U.S. Bank Nat'l Assoc. v. U.S. Timberlands Klamath Falls, L.L.C.,* 2004 WL 5388052, at *12 (Del.

Ch. Dec. 22, 2004). At a minimum, the approval must have been given in compliance with the implied covenant of good faith and fair dealing, which a partnership agreement "may not eliminate." 6 *Del. C.* § 17–1101(d).

*Brinckerhoff v. Texas E. Prods. Pipeline Co., LLC,* 986 A.2d 370, 390 (Del.Ch.2010) [hereinafter, *"TEPPCO"*]. Paraphrasing *Katz,* it could well be "clear from what was expressly agreed upon [*i.e.,* Special Approval by independent persons] that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of [*e.g.,* arbitrary or bad faith action by those persons] ... had they thought to negotiate with respect to that matter." *Katz,* 508 A.2d at 880.

But to recognize the legal principle does not mean the plaintiff has pled a colorable claim. To do so, the plaintiff would need to allege particularized facts from which this Court could infer that the members of the Audit Committee acted arbitrarily or in bad faith. In *TEPPCO,* for example, "the merger which received 'special approval' would extinguish strong claims against a controller, his colleagues, and his principal entities." 986 A.2d at 390. The factual record readily supported the inference that " 'a principal purpose of the merger was the termination of the then pending derivative claims.' " *Id.* at 383 (quoting *Merritt v. Colonial Foods, Inc.,* 505 A.2d 757, 763 (Del.Ch.1986) (Allen, C.)). There was also reason to question "whether the committee actually got value for the Derivative Action" such that "the consideration was fair *with* the Derivative Action." *Id.* at 393, 394. The record as a whole suggested that the committee might well have approved "the deal that the Special Committee would have negotiated anyway," and that the negotiations offered only "the illusion of resistance followed by the reality of submission." *Id.* at 393.

The operative LP agreement in *TEPPCO* also did not contain additional contractual standards regulating the Special Approval process, such as "the right to make the special approval determination in its 'sole discretion' or under a similar contractual grant of authority." *Id.* at 390.

The current complaint fails to raise a colorable challenge to the Special Approval decision. The complaint cites conflicts faced by directors who did not serve on the Audit Committee (most notably the three voting trustees) but does not raise *any* challenge to the disinterestedness or independence of the members of the Audit Committee. The complaint asserts generally that the individual defendants own interests in both Holdings and the Partnership and reproduces in abbreviated fashion the ownership table from the Form S–4. The table shows that each of the Audit Committee members who made the Special Approval decision owns more Holdings LP units than Partnership LP units. Rather than creating a disabling conflict, their cross-ownership (assuming it were material) would align their interests with the holders of Holdings LP units.

 The complaint's conclusory allegations about an inadequate deal process do not imply arbitrary or bad faith conduct, particularly in light of what the Form S–4 says the Audit Committee actually did, the terms it negotiated, and the financial analyses conducted by Morgan Stanley. *Cf. Lyondell*, 970 A.2d at 243–44 (finding stronger challenges to a sale process were insufficient to support claim that directors breached their fiduciary duties by acting in bad faith). When a party seeks to invoke the implied covenant, "[g]eneral allegations of bad faith conduct are not sufficient." *Kuroda*, 971 A.2d at 888.

Finally, unlike the LP agreement in *TEPPCO*, the Holdings LP Agreement contains additional provisions that expand the decisional discretion of Holdings GP and limit the ability of a limited partner to challenge its decisions, including a grant of Special Approval by the Audit Committee. For example, Section 7.10(b) states:

> [Holdings GP] may consult with legal counsel, accountants, appraisers, management consultants, investment bankers and other consultants and advisers selected by it, and any act taken or omitted to be taken in reliance upon the opinion (including an Opinion of Counsel) of such Persons as to matters that [Holdings GP] reasonably believes to be within such Person's professional or expert competence shall be conclusively presumed to have been done or omitted in good faith and in accordance with such opinion.

The Audit Committee received a fairness opinion from Morgan Stanley, and a fair summary of the opinion and underlying financial analyses appears in the Form S–4. The complaint does not allege (and a plaintiff could not colorably contend) that rendering a fairness opinion was not within Morgan Stanley's professional expert competence. On the present allegations, the grant of Special Approval must be "conclusively presumed to have been . . . in good faith."

The complaint does not plead a colorable challenge to the Special Approval decision. A colorable claim under the implied covenant would require more particularized facts and a more refined legal theory. A dashed-off effort to translate a cookie-cutter complaint from the world of corporations into the language of MLPs will not do the trick.

## C. Additional Theories

 In a reply letter in support of the motion to expedite, the plaintiff contends that the members of the Audit Committee, "*independent though they may be facially categorized,* [are] subject to inher-

ent conflicts of interest" because EPCO stands on both sides of the Proposed Transaction. (Emphasis added). In a controlling stockholder squeeze-out, independent directors are deemed subject to inherent coercion because of the controller's domineering presence. *See CNX Gas*, 2010 WL 2705147, at *5–8 (describing doctrine). The doctrine of inherent coercion has not been extended to limited partnerships. *R.S.M. Inc. v. Alliance Capital Mgmt. Hldgs. L.P.*, 790 A.2d 478, 498 n. 28 (Del.Ch.2001) ("[I]t would seem unwise to expand this doctrinal anomaly into the limited partnership setting."). This variation on the implied covenant claim is not colorable.

The plaintiff also writes in his reply letter that Special Approval might be ineffective because the Audit Committee is defined in the Holdings LP Agreement as "a committee of the Board of Directors of [Holdings GP] composed entirely of three or more directors who meet the independence, qualification and experience requirements established by the Securities Exchange Act and the rules and regulations of the Commission thereunder and by the New York Stock Exchange." Holdings LP Agreement at A–2. According to the plaintiff, "NYSE rules require members of an audit committee to be independent of the company and its management and to have not [sic] any relationship with the company or others that, when viewed from the perspective of a reasonable investor, appears to impair the exercise of independent judgment." No supporting authority, citation, or additional information is provided. There is no quotation from any source, only paraphrasing. In a footnote, the plaintiff claims that its "research" recently uncovered social and charitable connections between the members of the Audit Committee and EPCO. Plaintiff's counsel admitted during the hearing on the motion to expedite that the "research" con-

sisted of cribbing from complaints in pending derivative actions.

The new legal theory about the qualifications of the Audit Committee members does not implicate the implied covenant of good faith and fair dealing. It instead would claim that a contractual provision of the Holdings LP Agreement was violated. It is not currently pled, and there is no need for me to comment on an unpled claim.

## D. The Disclosure Allegations

■ The complaint also alleges that the defendants have violated the implied covenant of good faith and fair dealing by failing to disclose all material information reasonably available in connection with the LP unitholder vote. In the corporate context, the duty of disclosure is a fiduciary duty that "derives from the duties of care and loyalty." *Pfeffer v. Redstone*, 965 A.2d 676, 684 (Del.2009). The duty to disclose all material information reasonably available when seeking stockholder action represents "the application in a specific context of the board's fiduciary duties." *Malpiede v. Townson*, 780 A.2d 1075, 1086 (Del.2001). The duty not to speak falsely that applies whenever directors choose to communicate with stockholders similarly flows from a board's fiduciary duties. *Malone v. Brincat*, 722 A.2d 5, 14 (Del.1998). Likewise in the limited partnership context, absent contractual modification, a general partner owes fiduciary duties that include a "duty of full disclosure." *Sussex Life Care Assocs. v. Strickler*, 1988 WL 156833, at *4 (Del.Ch. June 13, 1989) ("There can be no question but that partners owe fiduciary duties to their fellow partners ... and this duty has been held to encompass a duty of full disclosure ...." (citing *Boxer v. Husky Oil Co.*, 429 A.2d 995 (Del.Ch.1981))). A limited partner who wishes to assert a disclosure claim therefore "must allege either a fiduciary

duty or a contractual duty to disclose." *Albert v. Alex. Brown Mgmt. Servs., Inc.,* 2005 WL 2130607, at *3 (Del.Ch. Aug. 26, 2005).

As discussed above, the Holdings LP Agreement eliminates all fiduciary duties, which therefore cannot support a disclosure obligation. The complaint does not identify a contractual duty to disclose material information in connection with the Proposed Transaction. To the contrary, in connection with the Proposed Transaction, the Holdings LP Agreement requires only that the limited partners be given notice of a meeting at which the vote on the merger will be held and that "[a] copy or a summary of the Merger Agreement shall be included in or enclosed with the notice." Holdings LP Agreement § 14.3(a).

In light of the specific informational rights provided in Section 14.3, the absence of any generalized contractual obligation, and the express elimination of fiduciary duties, I cannot infer an obligation to disclose all material information from the implied covenant of good faith and fair dealing. It would have been easy for the Holdings LP Agreement to provide for the disclosure of all material information. Rather than suggesting a gap that needs to be filled, the Holdings LP Agreement reflects a conscious decision to eliminate all fiduciary duties, including the duty of disclosure. *See Arnold v. Society for Sav. Bancorp, Inc.,* 650 A.2d 1270, 1287 (Del. 1994) (interpreting plain meaning of phrase "breach of fiduciary duty" in 8 *Del. C.* § 102(b)(7) as encompassing fiduciary disclosure requirements, which "were well-established when Section 102(b)(7) was enacted and were nonetheless not excepted expressly from coverage").

Nor is this a situation where "compelling fairness" requires that I invoke the implied covenant. *Dunlap v. State Farm Fire & Cas. Co.,* 878 A.2d 434, 442 (Del.2005). A Delaware Supreme Court decision from the corporate realm demonstrates that there is nothing inequitable about the level of disclosure provided by the Holdings LP Agreement—a meeting notice and copy or summary of the merger agreement. In *Stroud v. Grace,* 606 A.2d 75 (Del.1992), the controlling stockholders in a privately held corporation planned to amend the corporation's charter and by-laws at the company's annual meeting. *Id.* at 79–80. Because the minority's votes were not needed, no proxies were solicited. *Id.* at 80. The only information distributed in connection with the meeting was the statutorily required notice of meeting and a summary of the proposed charter amendments. *Id.* at 80, 85; *see* 8 *Del. C.* § 222(a) (requiring written notice of meeting); 8 *Del. C.* § 242(b)(1) (requiring that notice of meeting at which a charter amendment will be considered "set forth such amendment in full or a brief summary of the changes to be effected thereby"). A stockholder plaintiff asserted that the board of directors had a fiduciary duty to disclose all material information, and the Court of Chancery agreed. *Stroud,* 606 A.2d at 86.

On appeal, the Delaware Supreme Court reversed. The Supreme Court held that when directors were not seeking stockholder action, *viz.* not soliciting proxies, they only needed to comply with the statutory requirements. *Id.* at 87.

> [U]nder all of the circumstances here, the board had no duty to disclose anything beyond the requirements of section 242(b)(1) of the General Corporation Law. The board complied with its statutory duty and included with its notice both the certificates of incorporation and the proposed amendments.... Nor is the board's conduct inequitable.

*Id.* at 87. No additional disclosure was necessary. *Id.* The Supreme Court admonished the Court of Chancery to "act with caution and restraint when ignoring

the clear language of the General Corporation Law in favor of other legal or equitable principles." *Id.*

In *Stroud,* because the directors were not soliciting proxies, the fiduciary duty of disclosure was limited, and the meeting notice and a summary of the charter amendments sufficed. Under the Holdings LP Agreement, all fiduciary duties, including the duty of disclosure, have been eliminated. The meeting notice and summary or copy of the merger agreement called for by the Holdings LP Agreement parallel the information deemed sufficient in *Stroud.* In light of *Stroud,* it is not possible to say that the defendants have acted "arbitrarily or unreasonably," as would be required to invoke the implied covenant. *Nemec,* 991 A.2d at 1125–26. To the contrary, because the LP Act specifically authorizes the elimination of fiduciary duties, this Court must act with "caution and restraint" and decline to use the implied covenant as a basis for "ignoring the clear language" of Section 1101(d) and the Holdings LP Agreement. *Stroud,* 606 A.2d at 87.

 The plaintiff's disclosure claims are not colorable because the implied covenant cannot support a generalized duty to disclose all material information reasonably available. As the Form S–4 shows, the absence of a Delaware disclosure duty does not mean that holders of LP units will lack for information. Publicly traded MLPs remain subject to the federal securities laws. Limited partners also retain a state law remedy for common law fraud. *E.g., Gaffin v. Teledyne, Inc.,* 611 A.2d 467, 472 (Del.1992); *NACCO Indus., Inc. v. Applica, Inc.,* 997 A.2d 1, 26–33 (Del.Ch. 2009). What the plaintiff does not have is a colorable state law disclosure claim.

## III. CONCLUSION

The motion to expedite is denied. The case will proceed on a non-expedited schedule. **IT IS SO ORDERED.**