# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| CHRISTOPHER MILLER, an Individual, and CHRISTOPHER MILLER and LINDSAY MILLER as Trustees of the C & L MILLER REVOCABLE TRUST, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2017-0291-SG |
| HCP & COMPANY, HCP TRUMPET INVESTMENTS, LLC, HISPANIA PRIVATE EQUITY II, L.P., HISPANIA INVESTORS II, LLC, HCP PACHYDERM INVESTMENTS, INC., CARLOS SIGNORET, JASON SHAFER, MARK RUSSELL, and VICTOR MARURI, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: November 8, 2017
Date Decided: February 1, 2018

Jeremy D. Anderson, of FISH & RICHARDSON P.C., Wilmington, Delaware; OF COUNSEL: David S. Chipman, of CHIPMAN GLASSER, LLC, Denver, Colorado, *Attorneys for Plaintiffs*.

Tammy L. Mercer and Paul J. Loughman, of YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; OF COUNSEL: Christopher M. Mason, of NIXON PEABODY LLP, New York, New York; Carolyn G. Nussbaum, of NIXON PEABODY LLP, Rochester, New York, *Attorneys for Defendants*.

GLASSCOCK, Vice Chancellor

Before me is the Defendants' Motion to Dismiss an action seeking relief under the implied covenant of good faith and fair dealing inhering to an LLC operating agreement. Co-plaintiff Christopher Miller[1] was a cofounder of the LLC, Trumpet Search ("Trumpet"). As of May 5, 2016, HCP & Company, together with its affiliates (collectively, the "HCP Entities"), were the largest holders of membership units in Trumpet. As of that date, the members executed the Second Amended and Restated Operating Agreement (the "OA"). Under the OA, Trumpet created new "Class E" membership units, which, upon sale of Trumpet, would be entitled to a "first in line" payment of 200% of the holders' investment in the Class E units. One of the HCP Entities purchased approximately 80% of these new units, for a capital investment of just under $2 million. The HCP Entities also held nearly 90% of the existing "Class D" units; according to the OA, upon sale these units were next in line, also to receive 200% of the holders' investment. The HCP Entities had contributed around $12 million for the Class D units. Upon any sale, in other words, according to the waterfall provision of the OA, the HCP Entities were entitled to the bulk of the first $30 million, before sales proceeds would be available to holders of other classes of membership units.

The HCP Entities held a majority of the membership units in Trumpet, and under the OA they were entitled to appoint four of the seven managers on the

---

[1] The Plaintiffs are an individual and trustees of a trust.

1

Trumpet Board. According to the OA, where the Board approved a sale of the company, every member was obligated to consent to the sale. The OA also gave the Board sole discretion as to the manner of any sale, conditioned only on the sale being to an unaffiliated third party. The members explicitly agreed, under the OA, to waive all fiduciary duties, to one another and from the managers to the members.

According to the Plaintiffs, this created a perverse incentive. If the HCP-dominated Board determined to sell Trumpet, something like 90% of the first $30 million would go to the HCP Entities; of each additional dollar of sales proceeds, 0% would then go to the HCP Entities. Under the terms of the waterfall, other classes of members would receive millions of dollars in proceeds before the HCP Entities would again share—pro rata—in the sales price. In other words, the HCP-dominated Board would have an incentive to negotiate any sales price up to about $30 million, but little incentive to negotiate further.

In the Plaintiffs' view, this incentive played out predictably. Less than a year after the OA was adopted, HCP championed a sale to an unaffiliated third party, MTS Health Partners, L.P. ("MTS"). MTS initially offered $31 million. The HCP-allied majority of managers elected not to run an open sales process for Trumpet. They gave the non-affiliated managers—including Plaintiff Miller—little time to find alternative buyers. Trumpet, nonetheless, was able to undertake an abbreviated sales process, and put pressure on MTS to increase its offer, which it did, to $41

2

million and ultimately to $43 million.  The Trumpet Board approved the sale at $43 million.  The Plaintiffs argue that an open auction of Trumpet would have resulted in a substantially higher sales price, however.

The Plaintiffs acknowledge that all members eschewed fiduciary duties via the OA.  They nonetheless argue that I should find that the implied covenant provides a term that the parties would have employed had they considered the matter: that any sale of Trumpet required an open-market sale or auction to ensure maximum value for all members.  Implying an auction condition to any sale is necessary, according to the Plaintiffs, in light of the incentive created by the OA waterfall provisions, as described above.  The problem with the Plaintiffs' assertion, as I see it, is that the incentive complained of is obvious on the face of the OA.  The members, despite creating this incentive, eschewed fiduciary duties, and gave the Board sole discretion to approve the manner of the sale, subject to a single protection for the minority, that the sale be to an unaffiliated third party.  It thus appears that the parties to the OA did consider the conditions under which a contractually permissible sale could take place.  They avoided the possibility of a self-dealing transaction but otherwise left to the HCP Entities the ability to structure a deal favorable to their interests.  Viewed in this way, there is no gap in the parties' agreement to which the implied covenant may apply.  The implied covenant, like the rest of our contracts jurisprudence, is

meant to enforce the intent of the parties, and not to modify that expressed intent where remorse has set in.

Of course, if the parties had chosen to employ the corporate form here, with its common-law fiduciary duties, this matter would be subject to entire fairness review.[2] Here, the members forwent the suite of common-law protections available with the corporate form, and instead chose to create an LLC. Nonetheless, under our law an LLC itself implies default fiduciary duties; to eliminate such duties, the members must explicitly waive them.[3] They did so here, despite the presence of a controller with an incentive to take a quick sale, and a Board with sole discretion to approve such a sale, with the single safeguard that the sale must not be to an insider.

The Plaintiffs now regret agreeing to these provisions. Presumably, however, the OA was drafted to attract capital investment, by allowing an exit on terms favorable to the investors. If so, imposing an auction requirement that could put at risk a sale favorable to the Defendants in favor of attempting to achieve a higher price for the benefit of the other members would deprive the Defendants of a

---

[2] *See, e.g.*, *IRA Trust FBO Bobbie Ahmed v. Crane*, 2017 WL 7053964, at *6 (Del. Ch. Dec. 11, 2017) (noting that entire fairness review governs transactions "where the controller receives greater monetary consideration for its shares than the minority stockholders").

[3] 6 *Del. C.* § 18-1104 ("In any case not provided for in this chapter [governing LLCs], the rules of law and equity, including the rules of law and equity relating to fiduciary duties and the law merchant, shall govern."); *see also CSH Theatres, LLC v. Nederlander of San Francisco Assocs.*, 2015 WL 1839684, at *11 (Del. Ch. Apr. 21, 2015) ("In the absence of language in an LLC agreement to the contrary, the managers of an LLC owe traditional fiduciary duties of care and loyalty.").

4

negotiated-for benefit. In any event, because there is no gap for an "auction sale" term to fill, the Defendants' Motion to Dismiss must be granted. My reasoning follows.

## I. BACKGROUND[4]

*A. Parties*

Plaintiff Christopher Miller ("Miller") cofounded Trumpet Search, LLC in 2008, and he was a member and manager of Trumpet until it was sold.[5] He and his wife, Lindsay Miller, are trustees of the C & L Miller Revocable Trust, which also held membership units in Trumpet until its sale.[6] Miller brings this suit in his individual capacity; he and Lindsay Miller are also proceeding as trustees of the Miller Trust.[7]

Defendant HCP & Company ("HCP") is a Delaware limited liability company headquartered in Chicago, Illinois.[8] HCP is a private equity firm.[9] Defendant Hispania Private Equity II., L.P. ("HPE") is a Delaware limited partnership, and HCP Pachyderm Investments, Inc. ("HCP Pachyderm") is a Delaware corporation.[10]

---

[4] The facts, drawn from the Plaintiffs' Complaint and the exhibits attached to it, are presumed true for purposes of evaluating the Defendants' Motion to Dismiss.
[5] Compl. ¶¶ 3, 16, 31.
[6] *Id.* ¶ 3.
[7] *Id.*
[8] *Id.* ¶ 4.
[9] *Id.* ¶ 19.
[10] *Id.* ¶ 5.

Both are headquartered in Chicago.[11] Defendant HCP Trumpet Investments, LLC ("HCP Investments") and Defendant Hispania Investors II, LLC ("HPE Partner") are Delaware limited liability companies; they too are headquartered in Chicago.[12] HCP Investments is a wholly owned subsidiary of HCP, and HCP Pachyderm, HPE, and HPE Partner are HCP affiliates.[13]

Before Trumpet was sold, HCP Investments and HCP Pachyderm held the vast majority of Trumpet's Class D and Class E membership interests.[14] HPE, in turn, was the sole equity owner of HCP Pachyderm, and HPE Partner served as HPE's general partner.[15]

Defendant Carlos Signoret cofounded HCP and at all relevant times served as an "HCP-controlled" member of Trumpet's Board of Managers.[16] Defendant Jason Shafer is an HCP employee and serves as the president of both HCP Pachyderm and HCP Investments.[17] Like Signoret, Shafer was an HCP-controlled member of the Trumpet Board.[18] Defendant Victor Maruri cofounded HCP and served as an HCP-controlled member of Trumpet's Board.[19] Defendant Mark Russell works for HCP

---

[11] *Id.*
[12] *Id.*
[13] *Id.* ¶ 4.
[14] *Id.* ¶ 6.
[15] *Id.*
[16] *Id.* ¶ 7.
[17] *Id.* ¶ 8.
[18] *Id.*
[19] *Id.* ¶ 9.

6

and, like the other individual Defendants, was an HCP-controlled member of the Trumpet Board.[20]

*B. Factual Overview*

Miller and Franklin "Lani" Fritts founded Trumpet in 2008.[21] Trumpet offers clinical services to persons with autism and other developmental disabilities, and its primary focus is helping disabled children develop skills and cope with behavioral issues.[22] According to the Plaintiffs, Trumpet is one of the leading companies in this area, having benefited from favorable economic and political trends.[23]

1. The HCP Entities Acquire a Controlling Interest in Trumpet, and Trumpet Members Enter Into a New Operating Agreement

In late 2014, HCP Investments and HCP Pachyderm purchased the majority of Trumpet's Class D interests, making them the company's largest members.[24] HCP had formed HCP Investments and HCP Pachyderm to hold these membership interests and to appoint a majority of Trumpet's Board.[25] HCP's "team" consists of Signoret, Maruri, and Shaffer.[26] According to HCP's website, Trumpet is one of

---

[20] *Id.* ¶ 10.
[21] *Id.* ¶ 16. In 2009, Miller and Fritts formed Trumpet Behavioral Health, LLC, a wholly owned subsidiary of Trumpet. *Id.* I refer to Trumpet Search, LLC and Trumpet Behavioral Health, LLC as "Trumpet."
[22] *Id.* ¶ 17.
[23] *Id.* ¶ 18.
[24] *Id.* ¶ 22.
[25] *Id.* ¶ 19.
[26] *Id.* ¶ 20.

HCP's portfolio companies; the website also says that HCP looks for "high potential value companies still flying under the radar."[27]

On May 5, 2016, Trumpet's members entered into the Second Amended and Restated Operating Agreement.[28] Under the OA, Trumpet created a new class of membership interests "primarily for HCP Investments."[29] Holders of these new Class E units would be "entitled to a first-in-line, first-priority return of 200% of their Class E capital contribution."[30] The OA sets out the following distribution waterfall for determining members' returns on capital investment in the event of "a sale or otherwise":[31]

- First, Class E members would receive distributions in proportion to their capital contributions until they received 200% of their respective contributions.

- Second, Class D members would receive distributions in proportion to their capital contributions until they received 200% of their respective contributions.

- Third, participating Class A and B members would receive distributions in proportion to their capital contributions until they received 100% of their respective contributions.

- Fourth, nonparticipating Class A and B members would receive distributions in proportion to their capital contributions until they received 100% of their respective contributions.

---

[27] *Id.* ¶ 21.
[28] *Id.* ¶ 23.
[29] *Id.*
[30] *Id.*
[31] *Id.* ¶ 24.

- Fifth, nonparticipating Class C members would receive distributions in proportion to their capital contributions until they received 100% of their respective contributions.

- Sixth, Christopher Miller, Lani Fritts, Madrone Partners LP, and Leslie Margolin (a Trumpet member and manager) would receive distributions in proportion to their respective ownership of Participating Management Member Common interests until they received $1,092,500 in total.

- Seventh, all Trumpet members would receive distributions in proportion to their respective ownership interests until they received $6,907,500 in total.

- Eighth, Participating Management Members would receive distributions in proportion to their respective ownership of Participating Management Member Common Interest until they received an additional $1,092,500.

- Ninth, all Trumpet members would receive distributions in proportion to their respective ownership interests (not including unvested Common Interests).[32]

HCP Investments bought 78.5% of the new Class E units, representing a total capital investment of $1,963,354.[33] Thus, under the distribution waterfall, HCP Investments would receive a first-position payout of $3,926,708 if Trumpet were sold.[34] HCP Investments and HCP Pachyderm jointly held 87.5% of the Class D units, representing a total capital contribution of $12,000,000.[35] These two HCP entities were therefore entitled to a second-position payout of $24,000,000 in the

---

[32] *Id.*; Compl. Ex. 1, § 7.02(a). The distribution waterfall also contains a level for participating Class C members, but according to the Complaint no such members existed. Compl. ¶ 24 n.1.
[33] Compl. ¶ 25.
[34] *Id.*
[35] *Id.* ¶ 26.

9

event of a sale.[36]  For his part, Christopher Miller held 39.1% of the Participating Management Member Common Interest units.[37]  And the Miller Trust held 11,338 Class D units and 50,001 participating Class A units, representing capital investments of $19,654 and $50,001, respectively.[38]

Several other provisions of the OA bear mentioning.  Section 2.05 explicitly waives all fiduciary duties for Trumpet members, and Section 3.09 does the same for members of Trumpet's Board.[39]  Under Section 3.01(a), the HCP entities have the authority to appoint a majority of Trumpet's seven-person Board.[40]  They exercised that authority by appointing Signoret, Shafer, Russell, and Maruri to the Board.[41]  The remaining three Board positions were held by Miller, Fritts, and Leslie Margolin.[42]  Section 8.06 provides that if the Board approves a sale of all of Trumpet's membership units to an independent third party, every member is obligated to consent to the sale.[43]  If any member refuses to consent, the Board will

---

[36] *Id.*
[37] *Id.* ¶ 3.
[38] *Id.*
[39] Compl. Ex. 1, § 2.05 ("Except as otherwise provided in the [Delaware Limited Liability Company] Act, by law or expressly in this Agreement, no Member shall have any fiduciary or other duty to another Member with respect to the business and affairs of the LLC . . . ."); *id.* § 3.09 ("Notwithstanding any other provision of this Agreement or any duty otherwise existing at law or in equity, no Manager of the Board shall, to the fullest extent permitted by law, owe any duties (including fiduciary duties) to the Members or the LLC; provided, however, that the Board of Managers shall have the duty to act in accordance with the implied contractual obligation of good faith and fair dealing.").
[40] *Id.* § 3.01(a).
[41] Compl. ¶¶ 29–30.
[42] *Id.* ¶ 31.
[43] Compl. Ex. 1, § 8.06(a), (b).

be appointed as that member's attorney-in-fact so that it can sign, on the objecting member's behalf, any documentation necessary to consummate the sale.[44] And Section 8.06(a) provides that "the Board shall determine in its sole discretion the manner in which . . . an Approved Sale[, defined as a sale of all of Trumpet's membership interests to any independent third party,] shall occur, whether as a sale of assets, merger, transfer of Membership Interests or otherwise."[45] Section 8.06(a) also states that if the Board approves such a sale, "it shall notify the Members in writing of such Approved Sale and provide a description of the Approved Sale setting forth the reasonable details, terms, and conditions thereof."[46]

The Complaint alleges that when the OA was executed, the Plaintiffs "had the reasonable expectation . . . that before a sale of Trumpet, HCP's Board members, as directed by the HCP Entities, would execute an open-market process designed to achieve the highest value reasonably available for all [of] Trumpet's members, not just for the membership interests affiliated with HCP."[47] In other words, the Plaintiffs expected that any sale would be via an auction.

---

[44] *Id.* § 8.06(c).
[45] *Id.* § 8.06(a).
[46] *Id.*
[47] Compl. ¶ 36 (emphasis omitted).

11

## 2. The Sales Process

According to the Plaintiffs, once the HCP entities gained control of Trumpet, they set out to engineer a sale of the company that would give them, as holders of the vast majority of the Class D and E units, a 200% return on their investment.[48] The Defendants, in other words, were looking for a quick exit, and they paid no mind to the interests of members below them on the distribution waterfall.[49] Thus, in conducting the sales process, the Defendants declined to "pursue the highest value reasonably available for all Trumpet members."[50] The Plaintiffs allege that, instead of "engag[ing] in a reasonable open-market process to solicit the best available price for the company," the Defendants pushed through a below-market sale that allowed them to receive their 200% return but left the other members with little to nothing.[51] That, according to the Plaintiffs, constitutes a breach of the implied covenant of good faith and fair dealing.[52] I describe the sales process undertaken by the Defendants below.

On December 16, 2016, about seven months after the new OA was executed, the Trumpet Board met, and the HCP Board members stated that HCP planned on selling Trumpet to MTS Health Partners, L.P. for $31 million in the first quarter of

---

[48] *Id.* ¶ 37.
[49] *Id.* ¶¶ 37, 40.
[50] *Id.* ¶ 38.
[51] *Id.* ¶¶ 1, 78.
[52] *Id.* ¶¶ 1–2.

12

2017.[53] The non-HCP Board members were taken aback, and they "objected to the lack of an open-market process, and also to the low price."[54] Signoret, with Shafer and Russell's support, responded that the OA waived any fiduciary duties he might otherwise have had.[55] After receiving more pushback from the non-HCP Board members, Signoret "gave Trumpet five days to find competing offers and allowed Trumpet's CEO, Lani Fritts, to speak only to two entities who already had expressed interest in Trumpet."[56] While Maruri did not attend this (or any other) Board meeting, he "worked behind the scenes to support the proposals of the HCP Entities, and participated in the meetings via proxy to be applied in favor of the HCP Entities."[57]

After the December meeting, Trumpet reached out to the two funds that had previously expressed interest in the company.[58] According to the Plaintiffs, this outreach led to a letter of intent from one of those funds for a sale in the $36 million range.[59] It also caused MTS to increase its offer from about $31 million to $41 million.[60] The Plaintiffs infer from this increase that MTS "knew its offer was

---

[53] *Id.* ¶ 41.
[54] *Id.* ¶¶ 41–42.
[55] *Id.* ¶¶ 42–43.
[56] *Id.* ¶ 44.
[57] *Id.* ¶ 43.
[58] *Id.* ¶ 48.
[59] *Id.*
[60] *Id.* ¶ 49. The Plaintiffs allege that this offer was "effectively" for $39 million, but they never explain what that means. *Id.*

below-market and was trying to secure a bargain purchase without competing on the open market."[61] But the Defendants ignored this message and continued to reject "an open-market approach to achieve the highest price for Trumpet."[62] Instead, they pursued MTS's $41 million offer, which would provide the participating Class A and B members with "almost nothing," and would leave nothing at all for the nonparticipating Class A and B members, the Class C members, and the Common Interest members.[63]

About two months later, on February 24, 2017, Miller received an unsolicited voicemail message from Chris Harris, a representative of FFL Partners, LLC.[64] Miller called Harris back that evening, and Harris said FFL was interested in "a purchase of Trumpet's membership interests."[65] According to Harris, FFL "conservatively valued Trumpet's membership interests to be worth in excess of $50 million."[66] Harris also claimed that four out of five investors would agree with that valuation.[67] The next day, at Miller's request, Harris sent Miller a written non-

---

[61] *Id.* ¶ 50.
[62] *Id.*
[63] *Id.* ¶¶ 50–51.
[64] *Id.* ¶ 54.
[65] *Id.* ¶ 55.
[66] *Id.*
[67] *Id.*

14

binding indication of interest from FFL.[68]  In that letter, Harris valued Trumpet at between $50 million and $60 million.[69]

One day later, at a Trumpet Board meeting, Miller showed the FFL letter to the other Board members to bolster his position that MTS's $41 million offer was below market.[70]  The HCP Board members were suspicious of FFL's indication of interest because it raised the prospect of an open-market process, which "would delay their 2x payout."[71]  So these Board members, supported by the HCP entities, "colluded to marginalize the information regarding FFL's valuation, and push through the MTS transaction."[72]  In the first part of this scheme, the HCP Board members insisted that the Board tell MTS about FFL's indication of interest.[73]  Fritts and Shafer then contacted MTS about FFL's letter, and MTS said that it would revoke its offer if the sale did not close by the next week.[74]  Meanwhile, Shafer and Signoret had their own conversations with MTS without telling the other Board members.[75]  Shafer told MTS during his call that FFL had contacted Miller.[76]

---

[68] *Id.* ¶ 56.
[69] *Id.* ¶ 57.
[70] *Id.* ¶ 58.
[71] *Id.* ¶ 59.
[72] *Id.* ¶ 60.
[73] *Id.* ¶ 61.
[74] *Id.*
[75] *Id.* ¶ 62.
[76] *Id.*

The next day, on February 27, 2017, MTS representatives called Fritts "and threatened to sue Trumpet for violating a purported exclusivity provision in the MTS letter of intent . . . if Trumpet did not close the MTS transaction."[77] According to the Complaint, that threat was baseless, because nothing in MTS's letter of intent forbade Trumpet to "investigat[e] whether MTS's offer was below market price," and "[t]he only obligation relating to 'exclusivity' was an agreement to 'work in good faith to complete due diligence and execute definitive documentation.'"[78] During the call with Fritts, MTS also falsely accused Miller of reaching out to FFL.[79] The Plaintiffs allege that "MTS's threats derived from the unauthorized phone calls that Shafer and Signoret had with MTS on February 26, 2017."[80] And, according to the Plaintiffs, the Defendants used MTS's threats and accusations in an attempt to pressure the non-HCP Board members to close the MTS deal.[81]

The HCP Board members' plan ran into trouble when Fritts, Trumpet's CEO, pulled his support for the MTS deal at a March 2, 2017 Board meeting.[82] Fritts did not want to close the deal solely because of an unfounded threat of litigation.[83] The HCP Board members were reluctant to consummate the MTS sale without Fritts's

---

[77] *Id.* ¶ 63.
[78] *Id.* ¶ 67.
[79] *Id.* ¶ 63.
[80] *Id.* ¶ 64.
[81] *Id.* ¶ 66.
[82] *Id.* ¶ 69.
[83] *Id.*

support, so they "ostensibly" announced they "would drop the MTS transaction and pursue a more open-market approach."[84]  Shafer and Fritts then called MTS to inform it that Trumpet was no longer interested in the MTS deal.[85]  Shafer and Fritts were also supposed to call MTS to "explain[] the situation and defus[e] MTS's baseless claims regarding a lawsuit," but they were not authorized to renew purchase negotiations.[86]  Nevertheless, the HCP Board members proceeded to have calls with MTS in which they re-engaged MTS in sale negotiations.[87]

Just before a March 7, 2017 Board meeting, MTS increased its offer by around $1.6 million.[88]  MTS's letter of intent had expired by this point, but there were no other offers on the table.[89]  None of the entities in contact with Trumpet that had previously expressed an interest in the company made an offer during this part of the sales process.  The HCP Board members allegedly exploited this situation to "wear down" Fritts and Leslie Margolin, both of whom eventually approved the sale to MTS.[90]  Specifically, the HCP Board members employed "scare tactics about a possible lawsuit from MTS, and [made] threats that without the MTS deal, HCP would have several partners in Trumpet's offices on a weekly basis to monitor Lani

---

[84] *Id.*
[85] *Id.* ¶ 70.
[86] *Id.* ¶ 71.
[87] *Id.* ¶ 72.
[88] *Id.* ¶ 73.
[89] *Id.*
[90] *Id.* ¶ 74.

17

Fritts."[91]  During the March 7 meeting, Shafer admitted that HCP likely should have employed a more open-market process.[92]  But, Shafer said, given the lack of other offers on the table, the Board's only option was to accept MTS's roughly $43 million offer.[93]  The Complaint does not say whether the sale closed, but the Defendants assert that it did.[94]

Under MTS's approximately $43 million offer, participating Class A and B members receive almost nothing, but they are entitled to about one-third of their investment if they waive claims against the Board.[95]  Nonparticipating Class A and B members, Class C members, and Common Interest members receive nothing.[96]  The Plaintiffs aver that if an open-market sales process had been pursued, "it is reasonable that a much higher price could have been obtained."[97]  The Plaintiffs point out that if Trumpet had sold for $53 million, "all preferred classes of members (all the way through to the Class C members) would have received a full payout."[98]  Thus, in this scenario, "the Miller Trust would have received all $50,001 for its 'participating' Class A units (instead of the mere fraction it will receive from the

---

[91] *Id.*

[92] *Id.* ¶ 76.

[93] *Id.*  Again, the Plaintiffs allege that MTS's $43 million offer was "effectively" for $41 million, but they do not say why that was so.  *Id.* ¶ 78.

[94] Defs.' Opening Br. 2 n.3.

[95] Compl. ¶ 78.

[96] *Id.*

[97] *Id.* ¶ 79.

[98] *Id.*

18

MTS sale)."[99] As a result of his position as a Participating Management Member, Miller himself "would have received $.39 of every dollar for the first $1,092,500 above $53 million."[100] Miller would therefore have received an additional payout of $426,075 if Trumpet had sold for $54,092,500.[101] And if Trumpet had sold for $60 million, "Miller and the Miller Trust together would have received at least an additional $530,000, for a total payout to Miller and the Miller Trust of at least $1 million."[102]

*C. Procedural History*

The Plaintiffs filed their Complaint on April 14, 2017. It contains four counts: breach of the implied covenant of good faith and fair dealing against HCP Investments, HCP Pachyderm, Signoret, Shafer, Maruri, and Russell; aiding and abetting breach of the implied covenant of good faith and fair dealing against HCP, HPE, and HPE Partner; tortious interference with contract against HCP, HPE, and HPE Partner; and civil conspiracy against all Defendants.[103] On June 14, 2017, the parties agreed that HCP and HCP Pachyderm would be dismissed from this case without prejudice. Then, on June 20, 2017, the remaining Defendants moved to

---

[99] *Id.*
[100] *Id.* ¶ 80.
[101] *Id.*
[102] *Id.* ¶ 81.
[103] *Id.* ¶¶ 83–114.

19

dismiss the Complaint under Court of Chancery Rule 12(b)(6).  I held oral argument on that Motion on November 8, 2017.

## II. ANALYSIS

As just noted, the Defendants have moved to dismiss the Complaint under Court of Chancery Rule 12(b)(6).  When reviewing such a motion,

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[104]

I need not, however, "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[105]

### A. The Implied Covenant of Good Faith and Fair Dealing

The crux of the Plaintiffs' Complaint is that the Defendants breached the implied covenant of good faith and fair dealing by refusing to pursue a sales process designed to achieve the highest value reasonably available for all of Trumpet's members.  Instead, the Plaintiffs allege, the Defendants pushed through a below-market sale with MTS that allowed them to achieve a quick exit and a 200% return

---

[104] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (footnotes and internal quotation marks omitted).
[105] *Price v. E.I. DuPont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011).

20

on their capital investment but left the other Trumpet members with little to nothing. These allegations fail to state a claim for breach of the implied covenant.

The Delaware Limited Liability Company Act permits parties to an LLC agreement to eliminate fiduciary duties that members or managers would otherwise owe to one another.[106] That grant of authority reflects the LLC Act's policy "of giv[ing] the maximum effect to the principle of freedom of contract and to the enforceability of limited liability company agreements."[107] But an LLC agreement "may not eliminate the implied contractual covenant of good faith and fair dealing."[108] Indeed, the implied covenant inheres in every contract governed by Delaware law.[109] Here, the OA itself provides that the managers are bound by the implied covenant.[110] Because a claim for breach of the implied covenant is

---

[106] 6 *Del. C.* § 18-1101(c) ("To the extent that, at law or in equity, a member or manager or other person has duties (including fiduciary duties) to a limited liability company or to another member or manager or to another person that is a party to or is otherwise bound by a limited liability company agreement, the member's or manager's or other person's duties may be expanded or restricted or eliminated by provisions in the limited liability company agreement; provided, that the limited liability company agreement may not eliminate the implied contractual covenant of good faith and fair dealing."); *see also AM Gen. Holdings LLC v. The Renco Grp., Inc.*, 2016 WL 4440476, at *15 (Del. Ch. Aug. 22, 2016) (noting that "the LLC Act enables contracting parties to alter and even eliminate equitable fiduciary duties in the LLC context").

[107] 6 *Del. C.* § 18-1101(b).

[108] *Id.* § 18-1101(c).

[109] *Dieckman v. Regency GP LP*, 155 A.3d 358, 367 (Del. 2017).

[110] Compl. Ex. 1, § 3.09 ("Notwithstanding any other provision of this Agreement or any duty otherwise existing at law or in equity, no Manager of the Board shall, to the fullest extent permitted by law, owe any duties (including fiduciary duties) to the Members or the LLC; *provided, however, that the Board of Managers shall have the duty to act in accordance with the implied contractual obligation of good faith and fair dealing*."). The parties appear to assume that the OA's express language regarding "the implied contractual obligation of good faith and fair dealing" does not add to or subtract from the duties that would otherwise apply to Trumpet's managers via the

21

contractual, "the elements of an implied covenant claim are those of a breach of contract claim: 'a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff.'"[111]

Applying the implied covenant is a "cautious enterprise,"[112] and the doctrine is "rarely invoked successfully."[113] The implied covenant applies only when one party "proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected."[114] A party's reasonable expectations are measured as of the time of contracting,[115] and any implied terms must address "developments or contractual gaps that the asserting party pleads neither party anticipated."[116] The Court will not rewrite a contract simply because a party now wishes it had gotten a better deal.[117] And the implied covenant does not "establish a free-floating requirement that a party act in some morally commendable sense."[118] Instead, "good faith" in the implied covenant context entails "faithfulness to the scope, purpose, and terms of the parties'

---

implied covenant. Thus, I proceed on the assumption that the OA does not modify the obligations imposed by the implied covenant.

[111] *NAMA Holdings, LLC v. Related WMC LLC*, 2014 WL 6436647, at *16 (Del. Ch. Nov. 17, 2014) (quoting *Fitzgerald v. Cantor*, 1998 WL 842316, at *1 (Del. Ch. Nov. 10, 1998)).
[112] *Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010).
[113] *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009).
[114] *Nemec*, 991 A.2d at 1126.
[115] *Id.*
[116] *Id.* at 1125.
[117] *Id.* at 1126.
[118] *Allen v. El Paso Pipeline GP Co., L.L.C.*, 2014 WL 2819005, at *10 (Del. Ch. June 20, 2014), *aff'd*, 2015 WL 803053 (Del. Feb. 26, 2015).

contract."[119]  Similarly, "fair dealing" here does not imply equitable behavior.  The term "fair" is something of a misnomer here; it simply means actions consonant "with the terms of the parties' agreement and its purpose."[120]  Put differently, any implied obligation "must be consistent with the terms of the agreement as a whole."[121]

It follows that the first step in evaluating an implied covenant claim is to determine whether the contract in fact contains a gap that must be filled.[122]  That is because the implied covenant applies only if the contract is silent as to the subject at issue.[123]  If the contract directly addresses the matter at hand, "[e]xisting contract terms control . . . such that implied good faith cannot be used to circumvent the parties' bargain."[124]  If, on the other hand, the express terms of the contract do not address the subject at issue, the Court must then consider whether implied contractual terms fill the gap.[125]  The Court conducts that inquiry by asking "whether it is clear from what was expressly agreed upon that the parties who negotiated the

---

[119] *Gerber v. Enter. Prods. Holdings, LLC*, 67 A.3d 400, 419 (Del. 2013) (emphasis omitted), *overruled on other grounds by Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808 (Del. 2013).

[120] *Id.*

[121] *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 146 (Del. Ch. 2009).

[122] *Allen*, 2014 WL 2819005, at *10 (citing Mohsen Manesh, *Express Contract Terms and the Implied Contractual Covenant of Delaware Law*, 38 Del. J. Corp. L. 1, 19 (2013)).

[123] *E.g.*, *Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1032 (Del. Ch. 2006).

[124] *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441 (Del. 2005); *see also Shenandoah Life Ins. Co. v. Valero Energy Corp.*, 1988 WL 63491, at *8 (Del. Ch. June 21, 1988) ("Where . . . a specific, negotiated provision directly treats the subject of the alleged wrong and has been found to have not been violated, it is quite unlikely that a court will find by implication a contractual obligation of a different kind that has been breached.").

[125] *NAMA Holdings, LLC*, 2014 WL 6436647, at *16.

express terms of the contract would have agreed to proscribe the act later complained of as a breach of the implied covenant of good faith—had they thought to negotiate with respect to that matter."[126] The Court does not derive implied obligations from its own notions of justice or fairness.[127] Instead, it asks what the parties themselves would have agreed to "had they considered the issue in their original bargaining positions at the time of contracting."[128] The implied covenant therefore "operates only in that narrow band of cases where the contract as a whole speaks sufficiently to suggest an obligation and point to a result, but does not speak directly enough to provide an explicit answer."[129]

"When an LP [or LLC] agreement eliminates fiduciary duties as part of a detailed contractual governance scheme, Delaware courts should be all the more hesitant to resort to the implied covenant."[130] The reason is that an alternative entity agreement that waives all fiduciary duties "implies an agreement that losses should remain where they fall" rather than being shifted after the fact through fiduciary duty review.[131]

---

[126] *Katz v. Oak Indus., Inc.*, 508 A.2d 873, 880 (Del. Ch. 1986).
[127] *NAMA Holdings, LLC*, 2014 WL 6436647, at *17.
[128] *Gerber*, 67 A.3d at 418.
[129] *Airborne Health, Inc.*, 984 A.2d at 146.
[130] *Lonergan v. EPE Holdings, LLC*, 5 A.3d 1008, 1018 (Del. Ch. 2010).
[131] *Id.*

Here, the OA waives any fiduciary duties that Trumpet's members or managers would otherwise have owed one another.[132] And the OA does not, by its terms, require the Board, once it has decided to sell Trumpet, to conduct an open-market process designed to achieve the highest value reasonably available for all of Trumpet's members. But, according to the Plaintiffs, that requirement should be read into the OA via the implied covenant of good faith and fair dealing. The first question, then, is whether the OA is "truly silent" as to how Trumpet could be marketed and sold.[133]

The Defendants point out that Trumpet's OA explicitly addresses the issue of how the company could be sold. They point to Section 8.06(a), which provides that "the Board shall determine in its sole discretion the manner in which [a sale of all Trumpet membership units to an independent third party] shall occur, whether as a sale of assets, merger, transfer of Membership Interests or otherwise."[134] According to the Defendants, that provision expressly permits the Board to sell Trumpet without pursuing the open-market process proposed by the Plaintiffs, so long as the sale results from a transaction with an unaffiliated third party. Thus, the Defendants argue, there is simply no gap for the implied covenant to fill.

---

[132] Compl. Ex. 1, §§ 2.05, 3.09.
[133] *Allied Capital Corp.*, 910 A.2d at 1032.
[134] Compl. Ex. 1, § 8.06(a).

25

The Plaintiffs make two points in response. First, they maintain that Section 8.06(a) addresses only the "form" of a sale, not the methods the Board may employ in marketing the company. Specifically, they argue that the clause immediately following "the manner in which . . . an Approved Sale shall occur"—that is, "whether as a sale of assets, merger, transfer of Membership Interests or otherwise"—limits the Board's discretion concerning the "manner" of a sale to the structure of the transaction.[135] Thus, according to the Plaintiffs, there remains a gap in the OA as to the type of sales process the Trumpet Board could conduct if it decided to sell the company, a gap I should fill by imposing an auction-sale requirement. Second, the Plaintiffs suggest that even if the discretion conferred by Section 8.06(a) relates to the methods the Board may employ in marketing the company, the implied covenant requires that discretion to be exercised reasonably and in good faith.

I agree with the Defendants that the OA does not contain a gap as to how Trumpet could be marketed and sold. The OA is not silent as to that issue; to the contrary, it explicitly vests the Board with sole discretion as to the manner in which a sale is conducted, subject to the limitation that the company is ultimately sold to an unaffiliated third-party buyer. The Plaintiffs' reading of Section 8.06(a)—that it confers sole discretion only as to the structure or form of the transaction, not as to

---

[135] *Id.*

26

the sales process itself—is, to my mind, unreasonable.[136]  The plain and unambiguous meaning of that provision is that the Board can market the company in whatever manner it chooses (again, so long as the Board ultimately approves a sale to an independent third party), and that such discretion *includes* decisions about the form of the transaction.  Contrary to the Plaintiffs' interpretation, Section 8.06(a) could have, but does not, say that the Board has sole discretion as to the manner in which the company is sold, but only insofar as it may choose among "a sale of assets, [a] merger, [a] transfer of Membership Interests or [some other transactional structure]."[137]  Instead, that provision gives the Board unfettered discretion to determine both how the company will be marketed and how the sale will be structured, *so long as* the transaction does not involve insiders.

True, "[w]hen a contract confers discretion on one party, the implied covenant requires that the discretion be used reasonably and in good faith."[138]  But this Court has also held that "if the scope of discretion is specified, there is no gap in the contract as to the scope of the discretion, and there is no reason for the Court to look

---

[136] *See Fortis Advisors LLC v. Shire US Holdings, Inc.*, 2017 WL 3420751, at *5 (Del. Ch. Aug. 9, 2017) ("Questions involving contract interpretation can be answered as a matter of law on a motion to dismiss '[w]hen the language of a contract is plain and unambiguous.'" (alteration in original) (quoting *Allied Capital Corp.*, 910 A.2d at 1030)).

[137] Compl. Ex. 1, § 8.06(a).

[138] *Airborne Health, Inc.*, 984 A.2d at 146–47; *see also Gerber*, 67 A.3d at 419 ("When exercising a discretionary right, a party to the contract must exercise its discretion reasonably." (emphasis omitted)).

to the implied covenant to determine how discretion should be exercised."[139]  That holding follows from the principle that "[t]he implied covenant cannot be invoked to override the express terms of the contract."[140]  Here, the OA defines the scope of the Board's discretion by providing it with *sole* discretion to determine how to conduct a sales process, cabined by the requirement that any transaction be with an unaffiliated third party.[141]  The OA's language indicates that the members considered the implications of vesting discretion in a conflicted board; the language they agreed to thus leaves no room for the implied covenant to operate.[142]

---

[139] *Policemen's Annuity & Benefit Fund of Chicago v. DV Realty Advisors LLC*, 2012 WL 3548206, at *12 (Del. Ch. Aug. 16, 2012), *aff'd sub nom. DV Realty Advisors LLC v. Policemen's Annuity & Benefit Fund of Chicago*, 75 A.3d 101 (Del. 2013).

[140] *Kuroda*, 971 A.2d at 888.

[141] The Plaintiffs do not argue that the sale to MTS failed to qualify as an "Approved Sale," thereby removing the transaction from the ambit of the sole-discretion clause.  Thus, for purposes of deciding the Defendants' Motion to Dismiss, I assume that transaction with MTS was an "Approved Sale," defined as "a sale of all of the Membership Interests or equity interests in the LLC to any independent third party."  Compl. Ex. 1, § 8.06(a).

[142] *See Wilmington Leasing, Inc. v. Parrish Leasing Co., L.P.*, 1996 WL 560190, at *2 (Del. Ch. Sept. 25, 1996) ("Plaintiffs argue that that covenant should not be implied here, because the contract specifically addresses the removal of the general partner. I cannot agree, because although that subject is generally addressed, the specific question presented here-the scope of discretion allowed to the limited partners in effecting the general partner's removal-is not. The disputed provision does not, for example, explicitly state that the limited partners' determination will be 'in their sole discretion.'"); *Abex Inc. v. Koll Real Estate Grp., Inc.*, 1994 WL 728827, at *12 (Del. Ch. Dec. 22, 1994) (declining to apply the implied covenant because the contracts at issue "did not require Abex to consider Koll's idiosyncratic interests; on the contrary, they gave Abex the 'sole discretion' to settle"); *see also* Manesh, *supra*, at 23 ("The parties may agree that the discretion-exercising party enjoys unfettered, sole, and absolute discretion or, alternatively, limit the discretionary power with a reasonableness, good faith, or other like qualifier. Any such term would fill the gap in the contract by articulating the parties' bargained-for expectation." (footnotes omitted)).

28

The Plaintiffs cite several cases for the proposition that the implied covenant applies with particular force to contractual grants of sole discretion,[143] but those cases are not controlling here. An unqualified grant of sole discretion presents an obvious problem: the party entitled to exercise that discretion may abuse it for self-interested reasons and thereby deprive the other party of the benefit of its bargain. That explains why some courts have applied the implied covenant to sole-discretion clauses. Here, however, the parties explicitly addressed the potential for self-dealing inherent in such clauses by providing that the Board does not retain sole discretion to sell the company to insiders. In other words, the parties to Trumpet's OA recognized (and filled) the gap that some courts have discerned in contractual grants of sole discretion. Thus, because the Complaint fails to adequately allege any gap in the OA, the Plaintiffs' implied covenant claim must be dismissed.

Even if the Plaintiffs were correct that the OA contains a gap as to how Trumpet could be sold, their implied covenant claim must fail. That is because the Plaintiffs have offered no reason to believe that their reasonable expectations were

---

[143] *Charlotte Broad., LLC v. Davis Broad. of Atlanta, L.L.C.*, 2015 WL 3863245, at *7 (Del. Super. June 10, 2015) ("The implied covenant particularly applies where the contract permits a party to exercise sole discretion."), *aff'd sub nom. Davis Broad. of Atlanta, L.L.C. v. Charlotte Broad., LLC*, 134 A.3d 759 (Del. 2016); *CC Fin. LLC v. Wireless Props., LLC*, 2012 WL 4862337, at *5 n.53 (Del. Ch. Oct. 1, 2012) ("A contract which grants one party sole discretion with respect to a material aspect of the agreement may, through the implied covenant of good faith and fair dealing, require that the exercise of discretion be in good faith."); *Amirsaleh v. Bd. Of Trade of City of N.Y., Inc.*, 2008 WL 4182998, at *8 (Del. Ch. Sept. 11, 2008) ("The implied covenant is particularly important in contracts that endow one party with discretion in performance; i.e., in contracts that defer a decision at the time of contracting and empower one party to make that decision later.").

frustrated by the Defendants' conduct during the sales process. The question here is "whether it is clear from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of as a breach of the implied covenant of good faith—had they thought to negotiate with respect to that matter."[144] The goal of this inquiry is to infer the parties' reasonable expectations from the express terms of the contract.[145] Yet the Plaintiffs have failed to point to any provision in the OA that suggests the parties would have proscribed the manner in which Trumpet was marketed and sold if the issue had come up at the time of contracting. In fact, the express terms of the contract suggest precisely the opposite—that the parties actually contemplated that Trumpet might be sold through private negotiation rather than an open-market process.

For example, Section 8.06(a) provides that if the Board approves a sale of all of Trumpet's membership interests to an independent third party, "the Board shall notify the Members in writing of [the sale] and provide a description of the [sale]

---

[144] *Katz*, 508 A.2d at 880.

[145] *See Cincinnati SMSA Ltd. P'ship v. Cincinnati Bell Cellular Sys. Co.*, 1997 WL 525873, at *5 (Del. Ch. Aug. 13, 1997) ("A contractual obligation not expressly specified in a contract will not be inferred unless the Court, *by reference to the express terms of the contract*, can conclude that the parties to the contract, at the time of its drafting, would have agreed to be bound by the implied obligation." (emphasis added)), *aff'd*, 708 A.2d 989 (Del. 1998); *see also Dieckman*, 155 A.3d at 368 ("Our use of the implied covenant is based on the words of the contract and not the disclaimed fiduciary duties.").

setting forth the reasonable details, terms, and conditions thereof."[146]  If the parties had expected that Trumpet would be sold only via an open-market process, there would have been no need to include a provision in the OA requiring the Board to notify Trumpet's members when it approves a sale of the company.  Presumably, the members would learn about such a sale in any event if an open-market process were followed.  And while the OA describes several categories of information to which Trumpet's members are entitled, it does not require the Board to tell the members about an ongoing sales process.[147]  That suggests that the parties would not have foreclosed the possibility of a privately negotiated sale if the issue had come up during bargaining.  In short, there is no reason to think that the obligation the Plaintiffs ask me to insert into the OA would advance "the purposes reflected in the express language of the contract."[148]

To the contrary, the members agreed to a process that would enable investors to structure and time an exit at a very substantial premium to their investment, in a way that encouraged investment at the cost of fiduciary protections for earlier equity holders.  Presumably, circumstances warranted these terms.  Adding an auction sale

---

[146] Compl. Ex. 1, § 8.06(a).

[147] *Id.* § 2.08.

[148] *Alliance Data Sys. Corp. v. Blackstone Capital Partners V L.P.*, 963 A.2d 746, 770 (Del. Ch. 2009), *aff'd*, 976 A.2d 170 (Del. 2009).

requirement that the parties themselves failed to bargain for would alter—not enforce—the deal actually struck.

Moreover, the Defendants' conduct during the sales process was not arbitrary, unreasonable, or unanticipated *in light of the deal just described*; thus, there is nothing in the Complaint that might justify the use of the "limited and extraordinary legal remedy" of the implied covenant.[149] It is, I think, worth noting what the Plaintiffs have not alleged here. There are no allegations of fraud or a kickback from the buyer. There is no indication that the Defendants acted from any perverse or cryptic incentive, other than their own self-interest manifest from the waterfall provision of the OA—there is, for example, no indication that they acted with the purpose of harming the non-affiliated members. Such actions plausibly would be of the type addressed by the implied covenant.

It is true that the Complaint reflects a sales process that was tilted in favor of the Defendants' interests, but the parties to the OA could easily have anticipated that. In fact, the "perverse" incentive at the heart of this case—namely, the Defendants' interest in seeking a quick payout on their investment regardless of the effect on Trumpet's other members—is clear from the distribution waterfall itself.[150] That

---

[149] *Nemec*, 991 A.2d at 1128.

[150] The Defendants also had some incentive to seek the highest available price, to allow them to receive the pro rata distributions to which they were entitled under the distribution waterfall given sufficient sales proceeds. According to the Defendants, the sale price never came close to the first pro rata distribution. Nov. 8, 2017 Oral Arg. Tr. 13:13–16. In any case, the Plaintiffs' theory is

32

waterfall places the Defendants first in line for any distributions from a sale of the company, and it guarantees them a 200% return on their capital contributions in the event of a sale generating sufficient revenue. Moreover, the OA waives all fiduciary duties that Trumpet's members or managers might otherwise have assumed. And, as discussed above, the OA limits the Board's discretion concerning a sale by prohibiting it from using that discretion to approve a sale to an insider, a provision that suggests the parties were thinking about how conflicts of interest could affect the sales process. Thus, it cannot have come as a surprise to the Plaintiffs that the Defendants would exercise their contractual rights to pursue a sale that benefited them at the expense of Trumpet's other members. That dooms the Plaintiffs' implied covenant claim. As our Supreme Court has stated, "Delaware's implied duty of good faith and fair dealing is not an equitable remedy for rebalancing economic interests after events that could have been anticipated, but were not, that later adversely affected one party to a contract."[151]

---

that the Defendants simply wanted a quick payout that would allow them "to exit Trumpet as quickly as possible with as much of their 2x preference as possible." Compl. ¶ 52.

[151] *Nemec*, 991 A.2d at 1128. The Plaintiffs allege that when the OA was executed, they "would not have reasonably anticipated that HCP Entities and the HCP Board members would pursue a below-market sale price with one suitor, allow only five days, a week before Christmas, to find a competing suitor, limit the potential competing suitor to two entities, and deem this to be an acceptable sale process." Compl. ¶ 46. Even accepting this bald assertion, nothing in the language of the OA indicates that the parties would have agreed to shift the risk of losing an offer advantageous to the HCP Entities by requiring the Board to engage in a full auction process, however.

33

I note that the HCP Entities did not use their majority on the Board to consummate MTS's initial $31 million offer. While the Complaint alleges that the unaffiliated managers were given only five days to find a higher offer, the sales process ultimately played out over several months before a deal was finally approved. The Board also made some effort to increase Trumpet's sale price. Indeed, that effort bore substantial fruit: MTS's offer increased from about $31 million to approximately $43 million over the course of the sales process. Nor were the HCP Board members wholly unresponsive to the non-HCP Board members' concerns. For example, after the non-HCP Board members pushed back on MTS's initial offer, Signoret "gave Trumpet five days to find competing offers" and let Trumpet's CEO talk to two entities that had previously expressed interest in the company.[152] When Trumpet's CEO objected to the deal, the HCP Board members did not insist it go forward nonetheless. And by the time a deal was finally agreed to, approximately three months had passed since the initial offer, MTS had increased its offer by about a third, and no other offers were before the Board. Again, while the Plaintiffs complain that the HCP Board members refused to pursue FFL's non-binding indication of interest, there is nothing necessarily arbitrary or unreasonable about taking the offer in hand (MTS's roughly $43 million bid) over the one in the bush (FFL's unsolicited indication of interest, which valued Trumpet at between $50

---

[152] Compl. ¶ 44.

million and $60 million). The Plaintiffs in effect allege that the Defendants should have put the MTS offer at risk by negotiating for a better deal for Trumpet's other members. But the OA waives any fiduciary duties that the Defendants otherwise would have owed to Trumpet's other members. The Plaintiffs seek to get around this contractual waiver by invoking the implied covenant. I reject the Plaintiffs' attempt to "re-introduce fiduciary review through the backdoor of the implied covenant."[153] As this Court has made clear, "[t]o use the implied covenant to replicate fiduciary review 'would vitiate the limited reach of the concept of the implied duty of good faith and fair dealing.'"[154]

Finally, if the Plaintiffs had wanted protection from self-interested conduct by the Defendants, they could easily have drafted language requiring the Board to implement a sales process designed to achieve the highest value reasonably available for all of Trumpet's members.[155] The Plaintiffs also could have sought other protections, such as a minimum sales price, a majority-of-the-minority sales provision, or a period during which sales were prohibited. Such a contract would, of course, have been less attractive to investors. Instead, the Plaintiffs struck an

---

[153] *Lonergan*, 5 A.3d at 1019.

[154] *Id.* (quoting *Nemec*, 991 A.2d at 1128).

[155] *See Nationwide Emerging Managers, LLC v. Northpointe Holdings, LLC*, 112 A.3d 878, 897 (Del. 2015) ("An interpreting court cannot use an implied covenant to re-write the agreement between the parties, and 'should be most chary about implying a contractual protection when the contract could easily have been drafted to expressly provide for it.'" (footnote omitted) (quoting *Allied Capital Corp.*, 910 A.2d at 1035)).

35

investor-friendly bargain with which they are now dissatisfied. But "[p]arties have a right to enter into good and bad contracts[;] the law enforces both."[156] It does not fall to this Court to give the Plaintiffs what they failed to get at the bargaining table.[157] Thus, the Complaint fails to state a claim for breach of the implied covenant of good faith and fair dealing.

### B. The Plaintiffs' Remaining Claims

It is undisputed that the Plaintiffs' claims for aiding and abetting breach of the implied covenant, tortious interference with contract, and civil conspiracy depend on adequately alleging a claim for breach of the implied covenant of good faith and fair dealing. Because the Plaintiffs have failed to do that, the remaining claims must be dismissed.[158]

## III. CONCLUSION

For the foregoing reasons, the Defendants' Motion to Dismiss is granted. An appropriate order is attached.

---

[156] *Nemec*, 991 A.2d at 1126.

[157] *See Nationwide Emerging Managers, LLC*, 112 A.3d at 881 ("When a buyer and seller negotiate a detailed contract, Delaware law requires that the contract's express terms be honored, and prevents a party who has after-the-fact regrets from using the implied covenant of good faith and fair dealing to obtain in court what it could not get at the bargaining table." (footnote omitted)).

[158] *See, e.g.*, *In re El Paso Pipeline Partners, L.P. Derivative Litig.*, 2014 WL 2768782, at *23 (Del. Ch. June 12, 2014) (granting summary judgment on claims for aiding and abetting breach of contract and tortious interference with contract because "[b]oth counts s[ought] to impose secondary liability on other actors for their involvement in the primary wrong asserted in Count I[, which had been dismissed]"); *Kuroda*, 971 A.2d at 892 (dismissing the plaintiff's civil conspiracy claim because the "plaintiff has failed to properly allege the elements of an underlying wrong that would be actionable in the absence of a conspiracy").

36

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | |
|---|---|
| CHRISTOPHER MILLER, an Individual, and CHRISTOPHER MILLER and LINDSAY MILLER as Trustees of the C & L MILLER REVOCABLE TRUST, <br><br> Plaintiffs, <br><br> v. <br><br> HCP & COMPANY, HCP TRUMPET INVESTMENTS, LLC, HISPANIA PRIVATE EQUITY II, L.P., HISPANIA INVESTORS II, LLC, HCP PACHYDERM INVESTMENTS, INC., CARLOS SIGNORET, JASON SHAFER, MARK RUSSELL, and VICTOR MARURI, <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) C.A. No. 2017-0291-SG <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## ORDER

AND NOW, this 1st day of February, 2018,

The Court having considered the Defendants' Motion to Dismiss, and for the reasons set forth in the Memorandum Opinion dated February 1, 2018, IT IS HEREBY ORDERED that the Motion to Dismiss is GRANTED.

SO ORDERED:

/s/ Sam Glasscock III

Vice Chancellor