# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

MARUBENI SPAR ONE, LLC,    )
    )
    Plaintiff,    )
    )
    v.    ) C.A. No. 2018-0908-SG
    )
WILLIAMS FIELD SERVICES – GULF    )
COAST COMPANY, L.P.,    )
    )
    Defendant.    )

## MEMORANDUM OPINION

Date Submitted:  October 18, 2019
Date Decided:  January 7, 2020

Brian E. Farnan and Michael J. Farnan, of Farnan LLP, Wilmington, Delaware; OF COUNSEL: Thomas J. Heiden, Mary Rose Alexander, and Thomas A. Benhamou, of Latham & Watkins LLP, Chicago, Illinois, *Attorneys for Plaintiff Marubeni Spar One, LLC*.

Adam V. Orlacchio, of Blank Rome LLP, Wilmington, Delaware; OF COUNSEL: Barry Abrams, Joshua A. Huber, and Stephanie Holden, of Blank Rome LLP, Houston, Texas, *Attorneys for Defendant Williams Field Services – Gulf Coast Company, L.P.*

GLASSCOCK, Vice Chancellor

Sports-fishermen on the U.S. East and Gulf coasts are well acquainted with the "canyons," the drowned mouths of prehistoric great rivers whose inshore depths attract gamefish. In the Gulf of Mexico, the canyons also provide access to offshore oil and gas reserves. While onshore oilfield names are primarily descriptively prosaic (the East Texas field, the Permian Basin, etc.), offshore field names—at least, so the facts here would suggest—tend more towards whimsy. This matter involves production from the Tubular Bells field, located in the Mississippi Canyon off New Orleans, and the neighboring Gunflint field.

Production from oil fields below thousands of feet of water is, to my mind, an engineering marvel. Once the oil is located, the wells are installed and the oil and gas pumped from deep underground, the job is only begun—the product must be transported to an onshore facility for processing and refining. The installation at issue here—the Tubular Bells platform[1]—is designed for that task; it is a floating manifold moored in the Mississippi Canyon that receives oil and gas, and pumps it ashore. It was built to serve the Tubular Bells field by the Defendant, Williams Field Services – Gulf Coast Company, L.P. ("Williams"). Williams currently owns 51% of the company that owns the facility, Gulfstar One, LLC ("Gulfstar," or, the

---

[1] The "platform" is variously referred to in the record as "Tubular Bells" and "Gulfstar One"; although the Plaintiff's complaint uses the latter, I employ "Tubular Bells platform" here as, I hope, less conducive to confusion.

"Company"). The remainder is owned by the Plaintiff, Marubeni Spar One, LLC ("Marubeni").

As will be explained in detail below, the interests of the two litigants in the profits from Gulfstar are provided by contract. In simplified form, the contracts provide that the net revenue from Gulfstar's Tubular Bells field operation is split 51% to Williams, 49% to Marubeni.

As described above, however, the Tubular Bells platform is a manifold or "hub," it can receive oil and gas from more than one source. The parties provided for Marubeni to have the option to participate should Gulfstar have the opportunity to handle product from new fields. If Marubeni chooses to participate, revenue from these new projects (each, an "Expansion Project") is split 87.75% to Williams and the remainder to Marubeni, net of expenses incurred. Marubeni has participated in one Expansion Project, which serves the Gunflint field.

The parties' disagreement, and this Action, involves which expenses are "incurred" in connection with the Gunflint Project. Williams contends it is the out-of-pocket costs of hooking Gunflint into the Tubular Bells platform, and the project's direct operating costs. This reading allocates the fixed costs associated with the Gulfstar installation to the Tubular Bells distribution. Because Williams' percentage of profit is higher from Gunflint, this reading is in its economic interest. Marubeni, unsurprisingly, takes the view that all expenses should be allocated

2

between the two projects; this reading is in its economic interest. Marubeni asks for a judgment vindicating its position, and seeks specific performance and damages, via this suit.

Williams has moved to dismiss, citing what it contends is the plain language of the contracts at issue. Marubeni has moved for partial summary judgement also alleging that I may decide the meaning of the contracts solely from the language therein.

The technology employed by all parties exploiting the oil reserves of the deep-water Gulf of Mexico is mind-boggling. These are engineering projects of the most sophisticated type. The legal issue, by contrast, is mundane. Upon review of the documents at issue in light of the complaint, I find that the intention of the parties is unclear, and interpretation would benefit from a record. Therefore, the cross-motions are denied with respect to the contract claims.

My reasoning follows.

# I. BACKGROUND[2]

## A. *The Company and the Parties*

Gulfstar is a Delaware limited liability company[3] and a midstream oil and gas company.[4] Gulfstar owns a floating production system moored 135 miles southeast of New Orleans, Louisiana in the Gulf of Mexico.[5] Gulfstar's production system "acts as a hub that aggregates and combines production handling services with oil and gas export pipeline services, which feed downstream oil and gas gathering and processing services on the Gulf Coast."[6]

Williams[7] is a Delaware limited partnership, and both a Member and the Operating Member of Gulfstar.[8] Williams has a 51% Percentage Interest in Gulfstar.[9]

---

[2] The facts, except where otherwise noted, are drawn from the well-pled allegations of the Plaintiff's Verified Complaint (the "Complaint" or "Compl.") and exhibits or documents incorporated by reference therein, which are presumed true for purposes of evaluating the Defendant's Motion to Dismiss.

[3] Compl., Ex. A, Limited Liability Company Amended and Restated Operating Agreement of Gulfstar One LLC (the "LLC Agreement"), at 1.

[4] *Id.* ¶ 7.

[5] *Id.*

[6] *Id.*

[7] The Defendant indicated in its briefing that it has changed its name to Williams Field Services – Gulf Coast Company LLC. "Williams" refers to the entity under either name and the change does not affect this Memorandum Opinion.

[8] Compl., ¶¶ 8, 12. The LLC Agreement notes: "The day-to-day business and affairs of the Company shall be managed by or under the direction of a Member designated as the Operating Member . . . ." LLC Agreement, § 5.6.

[9] Compl., ¶ 11. Percentage Interest is defined in the LLC Agreement, in part as: "with respect to each Member, a fraction (expressed as a percentage), the numerator of which is the Member Contributions of that Member, and the denominator of which is the Total Member Contributions." LLC Agreement, § 1.2.

Marubeni is a Delaware limited liability company and a Member of Gulfstar.[10] Marubeni invests in infrastructure projects for oil and gas production, processing, transportation, and distribution.[11] Marubeni has a 49% Percentage Interest in Gulfstar.[12]

*B. Tubular Bells and Marubeni's Investment*

Williams' parent company, Williams Partners, founded Gulfstar in 2011 to "provide oil and gas handling services for Tubular Bells, a deepwater oil and gas field in the Gulf of Mexico."[13] Gulfstar's first platform (the Tubular Bells platform)— intended to service the Tubular Bells field—was engineered to process 60,000 barrels of oil per day and 132 million standard cubic feet of gas per day.[14]

Marubeni became a Member in Gulfstar on January 18, 2013 when Williams and Marubeni entered into a Contribution Agreement.[15] Pursuant to the Contribution Agreement, Marubeni was issued a 49% Percentage Interest in Gulfstar in exchange for a cash contribution of $187 million.[16] Gulfstar is governed in part by an Amended and Restated Operating Agreement (the "LLC Agreement") and an

---

[10] Compl., ¶¶ 3, 11.
[11] *Id.* ¶ 9.
[12] *Id.* ¶ 11.
[13] *Id.* ¶ 8.
[14] *Id.*
[15] *Id.* ¶ 10.
[16] *Id.*

Operating Member Services Agreement (the "Operator Agreement"),[17] each between Marubeni and Williams and effective as of April 1, 2013.[18]

*C. The LLC Agreement and Operator Agreement*

The LLC Agreement and the Operator Agreement delineate standards of conduct for Williams as the Operating Member. Williams "shall manage and control the Company's business, properties and affairs to the best of its ability and shall use commercially reasonable efforts to carry out the business of the Company."[19] Additionally, Williams "shall perform the Operating Services[20] in a timely manner in accordance with the Prudent Operating Standards."[21] Section 5.15 of the LLC Agreement notes:

> Notwithstanding any provision of this Agreement . . . (a) Williams and any successor Operating Member shall have no liability under this Agreement or otherwise to the Company or any Member for any actions taken in its capacity as Operating Member or for any actions it fails to

---

[17] Compl., Ex. B, Operating Member Services Agreement (the "Operator Agreement").

[18] Compl., ¶ 13.

[19] LLC Agreement, § 5.6.

[20] This includes, in part: "[o]perat[ing], manag[ing] and direct[ing] the maintenance, upkeep and repair of the Gulfstar One Facilities . . .", "[s]upervis[ing], direct[ing], oversee[ing], coodinat[ing] and provid[ing] services to the extent requirement of Company . . .", and "[s]upervis[ing], dirtect[ing], oversee[ing], coordinat[ing], approv[ing] and obtain[ing] the procurement and purchase of all materials, components and equipment required to operate and maintain the Gulfstar One Facilities . . . ." Operator Agreement, § 2.2.2.

[21] *Id.* § 2.3. Prudent Operating Standards is defined in the LLC Agreement as: "acting in accordance with (i) all Laws and Permits, at the minimum federal safety standards set forth in all Laws and Permits, (ii) nationally recognized codes and standards applicable to the Operating Services, and (iii) those standards, practices, methods, and procedures that, at a given time in light of the circumstances then known, are generally accepted for use in the operation of facilities like the Gulfstar One Facilities in accordance with the Project Operating Agreements, and are consistent with general offshore oilfield practices applicable to facilities such as the Gulfstar One Facilities." LLC Agreement, § 1.2.

take unless it breaches its obligations under this Agreement as a result of its gross negligence, fraud or willful misconduct . . . .[22]

The Operator Agreement has a similar provision:

Operating Member shall have no liability to any Non-Operator Indemnitee,[23] and each Non-Operator Indemnitee hereby releases Operating Member from any liability, under this Operating Member Services Agreement or otherwise in connection with the Project or the performance of Operating Member Services by Operating Member or its failure to perform any such services unless Operating Member commits a breach of its obligations under this Operating Member Services Agreement involving Operating Member's gross negligence, fraud or willful misconduct.[24]

Important to this Action, the LLC Agreement contains a formula to distribute Gulfstar's Available Cash.[25] Section 4.3.2 reads:

Within thirty (30) days following the end of each Quarter ending after the date of First Production an amount equal to 100% of Available Cash with respect to such Quarter shall, subject to Section 18-607 of the Delaware Act, be distributed by the Company in accordance with this Article 4 (ALLOCATIONS AND DISTRIBUTIONS) as follows:

(a) first, to Williams an amount equal to the lesser of (i) the Handling Amount with respect to such Quarter and (ii) the amount of GAAP Net Income of the Company with respect to such Quarter,

(b) second, to Williams until Williams has received cumulative distributions pursuant to this Section 4.3.2(b) in an amount equal to the Third Party Production Amount with respect to such Quarter and all prior Quarters,

---

[22] LLC Agreement, § 5.15.
[23] Defined as "the Company and its other Members, and any Affiliates, officers, employees, agents, borrowed servants and contract employees of each of the foregoing . . ." Operator Agreement, § 11.1.
[24] *Id*. § 11.2(a).
[25] Compl., ¶ 27.

7

(c) third, to Williams an amount equal to the Positive Value Amount, if any, with respect to such Quarter, and

(d) thereafter, to the Members in accordance with their Percentage Interests.[26]

This dispute centers on the definition of Third Party Production Amount ("TPPA") as used in Section 4.3.2(b). From Marubeni's Verified Complaint (the "Complaint"), it appears that the TPPA is $0 for distributions from Tubular Bells whereas the TPPA is positive for other projects as discussed below, leading to divergent distribution outcomes.

*D. Expansion Projects and Sole Risk Projects*

The Tubular Bells platform was designed with the ability to expand production by the construction of new projects able to utilize the platform's "facilities and resources."[27] The LLC Agreement allows either Williams alone, or both Williams and Marubeni, to participate in the construction, and share in the proceeds, of a new project.[28] Put simply, if Marubeni decides not to participate in a new project, the project is a "Sole Risk Project," and "Williams receives all of the benefits and incurs all of the costs associated with that project."[29] Conversely, if Marubeni decides to participate in a new project, the project is an "Expansion

---

[26] LLC Agreement, § 4.3.2.
[27] Compl., ¶¶ 1, 8.
[28] *See* LLC Agreement, § 5.22.4.
[29] Compl., ¶ 23.

Project" and "Marubeni and Williams share distributions and costs according to the terms of the LLC Agreement."[30]

The TPPA "specifies how net proceeds associated with any Expansion Project . . . are to be distributed."[31] TPPA:

> means the product of (a) any cash inflows received by the Company derived from Third Party Producer Agreements or production otherwise handled pursuant to an Expansion Project less associated cash outflows (including capital expenditures, operating expenditures and any other costs associated with such Expansion Project) incurred by the Company in connection therewith, and (b) 75%; provided, however, that this term shall not include revenues or associated costs related to Sole Risk Projects.[32]

Since Williams is to receive the TPPA pursuant to the distribution waterfall in Section 4.3.2 of the LLC Agreement, Williams receives 75% of the amount in clause (a) of the TPPA definition.[33] The remaining 25% falls to the bottom of the waterfall to be distributed "to the Members in accordance with their Percentage Interests."[34] Since Williams owns a 51% Percentage Interest in the Company, it receives 51% of this remaining 25%.[35] Williams is thus due 87.75% of the net proceeds of an Expansion Project. This contrasts to 51% of net proceeds for production from the Tubular Bells field.[36]

---

[30] *Id.* ¶ 24.
[31] *Id.* ¶ 28.
[32] LLC Agreement, § 1.2.
[33] Compl., ¶ 31.
[34] *Id.* (quoting LLC Agreement, § 4.3.2).
[35] *Id.* ¶ 1. This equals 12.75%.
[36] *Id.*

*E. The Gunflint Project*

The Company has developed one project other than Tubular Bells, the Gunflint Project ("Gunflint").[37] Gunflint is an Expansion Project.[38] "[A]ll projects, present . . . and future, of the Company" derive benefits from certain expenditures already undertaken by Gulfstar in connection with the Tubular Bells platform.[39] Williams, as the Operating Member, has not allocated certain costs to Gunflint, and instead has allocated them solely to Tubular Bells.[40] According to the Complaint, these costs include:[41] "(a) Operating and maintenance costs associate[sic] with Export Pipelines,[42] (b) Operating and maintenance costs associated with Hull and Mooring,[43] (c) Selling, General and Administrative expenses,[44] (d) Third Party

---

[37] *Id.*

[38] *Id.* ¶ 25.

[39] *Id.* ¶ 33.

[40] *Id.* ¶ 39.

[41] At Oral Argument, Williams maintained that the Complaint misstates its actual allocation of costs; that dispute is not pertinent at the pleadings stage.

[42] The Company "uses certain infrastructure that is shared among projects, such as pipeline, that takes commodity volumes from both Tubular Bells and Gunflint closer to shore." Compl., ¶ 33.

[43] "[T]he infrastructure that causes the floating platforms to remain onsite." *Id.*

[44] "[E]xpenses incurred to promote, sell and deliver the Company's services and to manage the overall Company, which necessarily includes the costs to promote, sell, deliver and manage each project of the Company." *Id.* ¶ 34.

Producer revenue sharing,[45] (e) Operating Member Fee,[46] (f) Handling Amounts,[47] and (g) ARO Expenditures.[48],[49] Marubeni alleges that the allocation of costs between Tubular Bells and Gunflint by Williams is inconsistent with the TPPA language in the LLC Agreement. That disagreement spawned this Action.

*F. Procedural Background of this Action*

Marubeni filed the Complaint on December 14, 2018. On March 7, 2019, Williams made two Motions: (i) to dismiss all counts of the Complaint other than that for a declaratory judgment or to stay such counts pending resolution of the declaratory judgment count and (ii) to stay discovery and for a protective order.[50] Marubeni subsequently moved for Partial Summary Judgment on April 29, 2019.[51] I heard Oral Argument on all outstanding Motions on October 10, 2019. During

---

[45] The Company "is required to share a portion of its revenues generated from Gunflint with Tubular Bells Producers." *Id.* ¶ 35.

[46] "Under Section 8.1 of the Operator Agreement, [the Company] must pay Williams, as Operating Member, a monthly fee for providing Operating Services to the Company. These Operator Services include, among other things, the operation, management, maintenance and performance of the Gulfstar One Facilities and the Project Operating Agreements." *Id.* Gulfstar One Facilities is a defined term in the LLC Agreement which includes the floating production systems and the pipelines used to export the production from the floating production systems. LLC Agreement, § 1.2.

[47] "The Handling Amount is the amount [the Company] pays Williams based on the Billable Oil Volumes and Billable Gas Volumes from both [Tubular Bells] and Gunflint[] as defined in the Production Handling Agreements between the Company and the Gunflint and Tubular Bell Producers, respectively. (Each project has a separate Production Handling Agreement with [the Company])." Compl., ¶ 37.

[48] "ARO stands for Asset Retirement Obligations and are the costs to abandon, remove and decommission the facilities of the Company." *Id.* ¶ 38 (internal quotation marks omitted).

[49] *Id.* ¶ 32.

[50] Mot. to Dismiss, D.I. 22; Mot. to Stay Disc. and for Protective Order, D.I. 23.

[51] Mot. for Summ. J., D.I. 33.

11

Oral Argument, at the request of Marubeni, I allowed Marubeni until October 18, 2019 to reconsider certain of its Counts. On October 18, 2019, Marubeni wrote me that all Counts remained. I considered the Motions submitted for decision on that date.

The Complaint pleads five Counts.

Count A asserts breach of contract against Williams. It alleges that Williams has not properly allocated costs "associated with" Gunflint and consequently breached (i) the LLC Agreement by failing to "use[] commercially reasonable efforts" in managing the Company[52] and (ii) the Operator Agreement by failing to "perform Operating Services in accordance with Prudent Operating Standards."[53]

Count B asserts breach of fiduciary duty against Williams. It alleges that Williams "owes Marubeni and the Company fiduciary duties" as the Majority Member and Operating Member of Gulfstar and breached those duties by "failing to allocate costs associated with Gunflint to Gunflint."[54]

Count C asserts breach of the "duty" of good faith and fair dealing against Williams. It alleges that Williams is breaching such duty by "engaging in unreasonable conduct which has the effect of preventing Marubeni from receiving

---

[52] Compl., ¶¶ 50, 52.
[53] *Id.* ¶¶ 50–51.
[54] *Id.* ¶¶ 55–56.

the fruits of its bargain and frustrates the overarching purpose of the LLC Agreement."[55]

Count D requests a declaratory judgment with a "final determination of the duties and obligations of the Operating Member" regarding the costs that must be allocated to Expansion Projects.[56]

Count E requests "an injunction requiring Williams to allocate costs associated with Expansion Projects to Expansion Projects and refrain from and avoid any further breaches of its contract obligations."[57]

## II. ANALYSIS

Williams has moved to dismiss this Action pursuant to Chancery Court Rule 12(b)(6).[58] The standard of review for a Rule 12(b)(6) motion is well settled:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the nonmoving party; and (iv) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[59]

---

[55] *Id.* ¶ 62.
[56] *Id.* ¶ 68.
[57] *Id.*
[58] Ch. Ct. R. 12(b)(6).
[59] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (footnotes and internal quotations omitted).

13

When reviewing a motion to dismiss, the court may take into consideration documents "incorporated into the pleadings by reference and may take judicial notice of relevant public filings."[60]

## A. The TPPA Definition

Notwithstanding the myriad of Counts pled by Marubeni, all relief sought in the Complaint hinges on whether Williams' cost allocation for Gunflint comports with the definition of TPPA. Resolving that issue requires an interpretation of that definition. In Delaware, "the proper interpretation of language in a contract is a question of law," and, "[a]ccordingly, a motion to dismiss is a proper framework for determining the meaning of contract language."[61]

When interpreting a contract, "the court strives to determine the parties' shared intent, 'looking first at the relevant document, read as a whole, in order to divine that intent.'"[62] Words should be interpreted "using their common or ordinary meaning, unless the contract clearly shows that the parties' intent was otherwise."[63] Where the language of a contract is "'clear and unambiguous,' the ordinary meaning

[60] *See Fairthorne Maint. Corp. v. Ramunno*, 2007 WL 2214318, at *4 (Del. Ch. Jul. 20, 2007) (internal citations omitted).

[61] *Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1030 (Del. Ch. 2006).

[62] *Pharmathene, Inc. v. Siga Techs., Inc.*, 2008 WL 151855, at *11 (Del. Ch. Jan. 16, 2008) (quoting *Matulich v. Aegis Comm'ns Grp., Inc.*, 2007 WL 1662667, at *4 (Del. Ch. May 31, 2007)).

[63] *Pharmathene*, 2008 WL 151855, at *11 (quoting *Cove on Herring Creek Homeowners' Assoc. v. Riggs*, 2005 WL 1252399, at * 1 (Del. Ch. May 19, 2005)).

of the language will generally establish the parties' intent."[64]  However, "[a] contract is ambiguous . . . when the language 'in controversy [is] reasonably or fairly susceptible of different interpretations or may have two or more different meanings.'"[65]  In ruling on a motion to dismiss, "a trial court cannot choose between two different reasonable interpretations of an ambiguous document."[66]  Thus, a party moving to dismiss must show that its interpretation is "the only reasonable construction as a matter of law."[67]

Reduced to its simplest form, allocation of cash available from Expansion Projects relies on computation of the TPPA.  That amount is derived by subtracting cash outflows from cash inflows and multiplying the difference by 75%.  The parties dispute the meaning of the cash outflows (or expense) part of the definition.  The disputed language reads: "less associated cash outflows (including capital expenditures, operating expenditures and any other costs associated with such Expansion Project) incurred by the Company in connection therewith."[68]

Williams' interpretation is that the definition limits TPPA expenses to those cash payments that Gulfstar has "become liable or subject to in connection with the

---

[64] *Narrowstep, Inc. v. Onstream Media Corp.*, 2010 WL 5422405, at *7 (Del. Ch. Dec. 22, 2010) (quoting *Brandywine River Prop., Inc. v. Maffet*, 2007 WL 4327780, at *3 (Del. Ch. Dec. 5, 2007)).

[65] *Id*. (quoting *Pharmathene*, 2008 WL 151855, at *11).

[66] *Id*. (citing *Appriva S'holder Litig. Co. v. EV3, Inc.*, 937 A.2d 1275, 1289 (Del. 2007)).

[67] *Id*. (quoting *Appriva*, 937 A.2d at 1289).

[68] LLC Agreement, § 1.2.

2016 Gunflint Expansion Project."[69]   To Williams, the phrase "cash outflows" excludes from the TPPA "the types of non-cash accrual items (such as ARO), or contingent future Gulfstar expenses that have not yet been paid (such as the Third Party Producer revenue sharing payments)."[70]   Further, in Williams' view, the "incur" language "impose[s] a temporal and causal limitation" such that "[p]re-existing Gulfstar operating and capital expenditures that Gulfstar 'incurred' long ago in connection with the Tubular Bells Project, are not . . . 'cash outflows . . . incurred by Gulfstar in connection []with' the later Gunflint Expansion Project."[71]   Thus "[i]f a Gulfstar capital expenditure, operating cost or other cost would not exist but for the existence of the Gunflint Expansion Project – then it was 'incurred' by Gulfstar 'in connection with' Gunflint and is to be included for purposes of calculating the TPPA."[72]   On the other hand, if a cost or expenditure would exist regardless of whether Gunflint was constructed, then it is not "incurred . . . in connection with" Gunflint and should not be included in the TPPA calculation.

Marubeni disagrees.  In Marubeni's reading, cash outflows "includes any and all past, present and future costs of expenditures, either directly or indirectly,

---

[69] Opening Br. in Support of Def.'s Mot. to Dismiss, D.I. 30, at 22 (citing *Towerhill Wealth Mgmt. LLC v. Bander Family P'ship, LP*, 2010 Del. Ch. LEXIS 129, at *34 (Del. Ch. Jun. 4, 2010)) (internal quotation marks omitted).

[70] *Id*. at 21.

[71] *Id*. at 22 (citing *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1160 (Del. 2010)).  Williams argues that "expenses related to hull and mooring, Export Pipelines, Operating Member Fees, the Handling Amount and SG&A" all existed "several years" before Gunflint.  *Id*. at 22–23.

[72] Reply Br. in Supp. of Def.'s Mot. to Dismiss, D.I. 49, at 7.

associated with Gunflint."[73]  Furthermore, Marubeni argues that the words of the LLC Agreement are "words of full inclusion" that "do not limit in type, amount or time the costs and expenditures to be deducted from the cash available of an Expansion Project."[74]  In support, Marubeni points to the word "any" towards the beginning of the TPPA definition and the phrase "any other costs" in the parenthetical.  Rejecting the "but for" interpretation proffered by Williams, Marubeni argues that "to the extent that . . . costs and expenditures are associated with Gunflint . . . the LLC Agreement requires that they be deducted from the cash available for distribution from Gunflint."[75]  To do otherwise, in the words of Marubeni, would "treat[] Gunflint like cost-free operation . . . in violation of the express terms of the LLC Agreement."[76]

Marubeni argued in its brief in opposition to Williams' Motion that the costs associated with Gunflint "must be allocated *at least* proportionately to Gunflint."[77] Somewhat confusingly, at Oral Argument, when asked how to allocate "capital expenditures, operating expenses" and other expenses between Tubular Bells and Gunflint, Marubeni's counsel stated that the "plain wording" of the LLC Agreement meant that "*all* of those costs and expenses are to be deducted from the cash available

---

[73] Answ. Br. in Opp'n to Def.'s Mot. to Dismiss, D.I. 42, at 23.
[74] *Id*. at 23–24.
[75] *Id*. at 26.
[76] *Id*.
[77] *Id*. at 28 (emphasis added).

for" Gunflint.[78]  When asked if he was suggesting that expenses "should all be shifted from Tubular Bells to the expansion project," Marubeni's counsel replied that he was "not suggesting that, but I think that's what the plain wording of the parties' agreement says."[79]  Marubeni's counsel, however, stated that it was not asking the Court to enforce the LLC Agreement based on that literal interpretation; instead "there should be a good-faith allocation of those costs and expenses between the expansion project and the original project."[80]  In other words, Marubeni takes the rather odd position that it entered a contract that plainly ascribes all costs for the operation of the Tubular Bells platform to Gunflint, while also maintaining that enforcing this express language would be unfair; it essentially, at least as expressed at Oral Argument, asks me to reform the contract.

If one accepts Marubeni's assertion that the contractual obligations must be construed to require a good-faith allocation of costs, then a methodology is needed to allocate expenses shared between Gunflint and Tubular Bells.  Marubeni's counsel stated at Oral Argument that I need not search far for such a formula because the expenses should be "split according to the exact same formula that the parties put into their contract to allocation[sic] and prorate costs and expenses for the sole-

---

[78] Oral Arg. Tr. 15:8–15:15 (emphasis added).
[79] *Id*. 15:17–15:22.
[80] *Id*. 16:6–16:9.

risk project" (that is, a new project with respect to which Marubeni opted out).[81] As with Gunflint, any Sole Risk Project would share certain costs with Tubular Bells. Section 5.22.3 of the LLC Agreement expressly allocates such costs by prorating all Company "Operating Costs"[82] for Sole Risk Projects on a Barrel of Oil Equivalent ("BOE") basis.[83]

Williams seizes on this same language, but insists that it cuts the other way: Williams argues that the inclusion of this expense allocation methodology for Sole Risks Projects—and its omission with respect to Expansion Projects—is *prima facie* evidence that the parties did not intend for this allocation methodology to determine TPPA expenses for Expansion Projects. Williams points out that Operating Costs is a defined term in the LLC Agreement, and used as such in Section 5.22.3, yet the expense portion of TPPA uses "operating costs" in the lowercase form, choosing not to incorporate the defined term. Thus, in Williams' view, "when Williams and Marubeni intended to allocate a prorated portion of existing [Company] expenses to

---

[81] *Id*. 18:4–18:7.

[82] Defined as: "all expenditures and all Internal Reimbursable Costs other than Project Completion Expenditures and Capital Expenditures of (a) Company and/or (b) Operating Member or any Affiliate of Operating Member, on behalf of Company, after the Gulfstar One Facilities become Operational, that, subject to the terms of this Agreement, (i) are reasonable and necessary for Company to fulfill its obligations under the Project Agreements or otherwise operate the Gulfstar One Facilities and the business of Company including all out-of-pocket costs and expenses payable to Third Parties and (ii) are reasonable and necessary for Operating Member to perform the Operating Member Services; provided, however, that, except for Internal Reimbursable Costs, this term shall not include any expenditures of Operating Member or one of its Affiliates that is not an External Cost." LLC Agreement, § 1.2.

[83] *Id*. § 5.22.3.

19

a new project – as is the case with a Sole Risk Project . . . the parties knew how to say so in a clear and specific way."[84]

I am faced with competing interpretations of the TPPA definition. Williams advocates that only those amounts which would not have been expended "but for" Gunflint should be allocated to Gunflint, while Marubeni proposes that a proportional amount of expenses as between Gunflint and Tubular Bells calculated on a BOE basis should, in fairness, be allocated to Gunflint, and argues that the contract language itself allocates *all* Tubular Bells platform expenses to Gunflint. At this litigation phase, I may not find for Williams unless its construction is the only reasonable construction as a matter of law. I thus must deny the Motion "unless [Marubeni] could not recover under any reasonably conceivable set of circumstances susceptible of proof."[85] I note that I must "accept as true all of the well-pleaded allegations of fact and draw reasonable inferences in [Marubeni's] favor."[86] In considering the Motion I am confined to the well-pled Complaint and the LLC and Operator Agreements, both incorporated therein.

Considering the Motion in light of the limited documents on which I may rely is all the more difficult in light of the immense complexity of the enterprise. The

---

[84] Opening Br. in Support of Def.'s Mot. to Dismiss., D.I. 30, at 25 (citing *Comerica Bank v. Glob. Payments Direct, Inc.,* 2014 Del. Ch. LEXIS 136, at *29 (Del. Ch. Aug. 1, 2014)).

[85] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 897 (Del. 2002) (citing *Kofron v. Amoco Chems. Corp.*, 441 A.2d 226, 227 (Del. 1982)).

[86] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) (citing *Malpiede v. Townson*, 780 A.2d 1075, 1082 (Del. 2001)).

costs and expenses for Tubular Bells and Gunflint arise from complicated feats of engineering with costs reaching well into the hundreds of millions of dollars.[87] Without a better understanding of how Tubular Bells and Gunflint operate, informed by evidence of what the parties intended when the LLC Agreement was signed, I cannot say as a matter of law that only Williams' interpretation of TPPA is reasonable.[88] This is notwithstanding the fact that the interpretation urged by Marubeni is not in fact one that it asks me to enforce, suggesting that it understands that its own interpretation is not reasonable. On this record, I find the language employed as to Expansion Project cost allocation ambiguous, and I cannot construe the contractual language as a matter of law.

For the forgoing reasons, Williams' Motion to Dismiss Marubeni's claims for breach of contract and declaratory judgment (Counts "A" and "D") are denied. Additionally, "Count E" seeks equitable relief for the breach of contract; it is not a freestanding cause of action, and survives the Motion to Dismiss.

### B. Good Faith and Fair Dealing

The allegations of the Complaint alleging breach of the "duty of good faith and fair dealing" are murky. To the extent that Marubeni refers to fiduciary good

---

[87] Compl., ¶ 16 ("Marubeni has committed to, and has invested, more than $500 million in Gulfstar One . . . .").

[88] I note that Williams introduced exhibits and other information, such as email correspondence and letters, in connection with its Motion, which Marubeni argues should convert the Motion to Dismiss into one for Summary Judgment. I have not considered any of this extrinsic information considering Williams' Motion, which thus remains a Motion to Dismiss.

faith, I address that below. To the extent that "Count C" refers to the implied covenant, it must be dismissed.

The covenant of good faith and fair dealing, so called, is implicit in every Delaware contract. The covenant, *pace* Marubeni, is not a license for a court to replace "unfair" terms with "fair."[89] It is essentially a tool of construction, by which a court may impose a term consistent with the intent of the parties to a contract. Where a party can show that it and its counterparty failed to address an issue, but it is clear what the parties would have done had they considered the issue, the covenant may be available as a gap filler.[90] A court in such a situation will not allow one party to oppress the other in a way inimical to their bargain via an overlooked term or unanticipated circumstance.[91]

In the Complaint, Marubeni identifies no such gap, nor could counsel, when pressed on the issue at Oral Argument. Instead, the parties clearly foresaw and

---

[89] *Nemec v. Shrader*, 991 A.2d 1120, 1128 (Del. 2010) ("Delaware's implied duty of good faith and fair dealing is not an equitable remedy for rebalancing economic interests after events that could have been anticipated, but were not, that later adversely affected one party to a contract.").

[90] *Lonergan v. EPE Holdings, LLC*, 5 A.3d 1008, 1018 (Del. Ch. 2010) ("The doctrine thus operates only in that narrow band of cases where the contract as a whole speaks sufficiently to suggest an obligation and point to a result, but does not speak directly enough to provide an explicit answer.") (quoting *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 146 (Del. Ch. 2009)); *Allen v. El Paso Pipeline GP Co., L.L.C.*, 2014 WL 2819005, at *10 (Del. Ch. June 20, 2014) ("The implied covenant of good faith and fair dealing is the doctrine by which Delaware law cautiously supplies terms to fill gaps in the express provisions of a specific agreement.").

[91] *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009) ("The implied covenant of good faith and fair dealing inheres in every contract and 'requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain.'") (quoting *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005)) (internal quotation marks omitted).

22

contracted concerning the precise situation at issue: investment by Marubeni in additional projects, and allocation of resulting profits. They laid out their agreement regarding such Expansion Projects in detail, although the parties dispute the meaning of that agreement. In this situation there is no room for application of the covenant. More to the point, Marubeni's pleading is deficient as a matter of law; assuming in its favor all pled facts and reasonable inferences, Marubeni cannot prevail on a claim based on the covenant of good faith and fair dealing. To that extent, Claim C must be dismissed.

*C. Fiduciary Duty*

In "Count B" Marubeni asserts a claim for breach of fiduciary duty, and may assert a breach of the fiduciary duty to act in good faith in "Count C" as well. These claims must be dismissed

LLC agreements import corporate fiduciary duties by default, unless the pertinent agreement provides to the contrary.[92] The parties to LLC agreements are free, however, to impose or eschew what duties they like; indeed, that is one of the advantages of the LLC form of entity.[93] Here, Williams, as Operating Member, is

---

[92] *Beach to Bay Real Estate Ctr. LLC v. Beach to Bay Realtors Inc.*, 2017 WL 2928033, at *5 (Del. Ch. July 11, 2017) ("Delaware LLCs are known for their contractual flexibility; however, our Courts have interpreted the Delaware LLC Act to imply default fiduciary duties to managers of a LLC unless such duties are clearly disclaimed.") (citing *Kelly v. Blum*, 2010 WL 629850, at *10 (Del. Ch. Feb. 24, 2010); *Feeley v. NHAOCG, LLC,* 62 A.3d 649, 661 (Del. Ch. 2012); H.B. 126, 147th Gen. Assemb. (Del. 2013)).

[93] 6 *Del. C.* § 18-1101 ("To the extent that, at law or in equity, a member or manager or other person has duties (including fiduciary duties) to a limited liability company or to another member

liable under the LLC Agreement only for "gross negligence, fraud or willful misconduct."[94]

In this Action, Marubeni alleges that as Operating Member of the Company, Williams has breached its duty to allocate costs incurred on behalf of the Gunflint Project for purposes of determining and distributing revenue. That is a purely contractual duty. If Williams has breached the contract, Marubeni is entitled to a remedy. Conversely, if Williams is complying with its contractual duty, Marubeni cannot plead a common-law fiduciary breach based on Williams' contractually-compliant action. The fiduciary duty causes of action must be dismissed.[95]

### D. Motion for Partial Summary Judgment

For the same reasons described in Part II.A of this Memorandum Opinion, Marubeni's Motion for Partial Summary Judgment is denied.

---

or manager or to another person that is a party to or is otherwise bound by a limited liability company agreement, the member's or manager's or other person's duties may be expanded or restricted or eliminated by provisions in the limited liability company agreement . . . .").

[94] LLC Agreement, § 5.15.

[95] *Renco Grp., Inc. v. MacAndrews AMG Holdings LLC*, 2015 WL 394011, at *7 (Del. Ch. Jan. 29, 2015) ("Delaware respects 'the primacy of contract law over fiduciary law in matters involving . . . contractual rights and obligations and does not allow fiduciary duty claims to proceed in parallel with breach of contract claims unless there is an independent basis for the fiduciary duty claims apart from the contractual claims.'") (quoting *Grayson v. Imagination Station, Inc.*, 2010 WL 3221951, at *7 (Del. Ch. Aug. 16, 2010)) (internal quotation marks omitted).

*E. Williams' Motion to Stay, and Motion to Stay Discovery and for Protective Order*

In light of my decision dismissing the non-contractual Counts of the Complaint, and denying the Motion to dismiss the contractual Counts, these Motions are moot.

### III. CONCLUSION

For the foregoing reasons Williams' Motion to Dismiss is granted in part and denied in part. Its remaining Motions are moot. Marubeni's Motion for Partial Summary Judgment is denied. The parties should submit an Order consistent with this decision.